**THE DURHAM MANUFACTURING COMPANY, Plaintiff,**

v.

**MERRIAM MANUFACTURING COMPANY, Allan E. Adams, and Aztec Industries, L.L.C., d/b/a American Metal Crafters, Defendants.**

**No. 3:99CV2583 (GLG).**

United States District Court, D. Connecticut.

Dec. 17, 2003.

Eric Lukingbeal, James P. Ray, Richard Michael Fil, Robinson & Cole, Hartford, CT, for Plaintiff.

Amy E. Souchuns, Gian–Matthew Ranelli, Joseph P. Williams, Shipman & Goodwin, James C. Graham, Pepe & Hazard, Hartford, CT, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOETTEL, District Judge.

Plaintiff, The Durham Manufacturing Company ("Durham"), has brought this

environmental suit pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.* ("CERCLA"), against Defendants, Merriam Manufacturing Company ("Merriam"), Allan E. Adams, and Aztec Industries, L.L.C. ("Aztec"), d/b/a American Metal Crafters, seeking to recover costs incurred in responding to soil and ground-water contamination allegedly caused by the release of hazardous substances by Defendants. Plaintiff has also invoked this Court's supplemental jurisdiction over its state-law environmental claims, in which it has sought indemnification, declaratory and equitable relief, costs, and attorneys' fees against Defendants. Following a six-day bench trial, the Court renders the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. The Parties

1. Plaintiff, The Durham Manufacturing Company, is a corporation organized under the laws of the State of Connecticut with its principal place of business in Durham, Connecticut.

2. Durham has operated a metal box fabrication business on a certain parcel of land known as 201 Main Street (formerly 84 Main Street), Durham, Connecticut (the "Durham Premises") since 1922. Its products include, *inter alia,* metal first aid kits, metal tool boxes, metal lock boxes, and metal cabinets, bins, drawers, packaging, and shelving.

3. Defendant, Merriam Manufacturing Company, was incorporated in Connecticut in 1851, and now has its principal place of business in Middletown, Connecticut.

4. From 1851 until March 1998, when a fire destroyed a portion of Merriam's plant and part of its manufacturing equipment, Merriam operated a metal box fabrication business in Durham, Connecticut, at 275–281 Main Street (the "Merriam Premis-

es"). In the earlier years, Merriam primarily manufactured kitchenware and metal toys. Over the years, however, Merriam evolved into a manufacturer of metal containers, boxes, cases, and other metal parts. In fact, Durham and Merriam are competitors, and customers have periodically left one company to purchase products from the other.

5. As a result of the fire, by year-end 1998, Merriam had discontinued all operations at the Merriam Premises.

6. Although located on the same street in Durham, the Merriam Premises and the Durham Premises are located on separate, non-contiguous parcels of land, with the Merriam Premises to the north of the Durham Premises.

7. During the period when both companies were conducting manufacturing operations in Durham, Connecticut, Durham was a much larger company than Merriam with sales as much as ten times greater than those of Merriam. Durham also employed significantly more employees than Merriam. In the late 1990's, Merriam had approximately 50 employees, compared to Durham's approximately 240 employees.

8. Defendant Allan E. Adams became part owner of Merriam in 1960 and, since 1964, has been the owner of 100 percent of the outstanding shares of Merriam's stock. He also serves as its President. At all times relevant hereto, the officers of Merriam were Allan E. Adams, President, and Donna Noonan, Corporate Secretary.

9. Since 1974, Adams has been the sole owner of a fee simple interest in the Merriam Premises, which Merriam leased from Adams. Adams still owns the Merriam Premises, which he now leases to another tenant.

10. Defendant, Aztec Industries, L.L.C., was incorporated in Connecticut on April 20, 1998, by Carolyn Adams, the wife

of Allan Adams, and Donna Noonan, Ken Pearson, and Daniel Pearson, who are the step-children of Allan Adams. On January 1, 1999, Aztec began manufacturing operations at 695 High Street in Middletown, Connecticut (the "High Street Premises").

11. Because of the fire in 1998, Merriam was required to use outside contractors for many of the manufacturing operations it had previously performed. This outsourcing of manufacturing operations by Merriam dramatically increased its cost of goods sold. In 1999, Aztec, doing business under the name "American Metal Crafters," began providing all of the manufacturing operations required by Merriam to fill its orders.

12. Aztec employs approximately twenty (20) former Merriam employees, as well as several supervisory employees from Merriam. Daniel Pearson was formerly in charge of purchasing and production for Merriam. He still performs those responsibilities for Aztec, as well as additional duties. Ken Pearson was formerly Sales Manager—Sales & Production for Merriam. He is currently employed by Merriam as its Sales Manager and is a member of Aztec. Donna Noonan was the controller and corporate secretary for Merriam. She continues to serve as Merriam's corporate secretary. She is also employed by Aztec and is a member of Aztec. Other employees of Aztec, including certain supervisory staff members, were also formerly employed by Merriam.

13. The High Street Premises were purchased in November 1998 by CAF Associates, L.L.C. ("CAF"), a Connecticut limited liability company of which Carolyn Adams is the sole member. The High Street Premises consist of approximately 157,000 square feet, of which 70,000 square feet were under lease to existing tenants at the time CAF acquired the property. CAF leases 85,069 square feet of the High Street Premises to Aztec pursuant to a written lease agreement for a term of five years, commencing on January 1, 1999. CAF leases another 1,000 square feet of the High Street Premises to Merriam pursuant to a written lease agreement, also for a five-year term, commencing January 1, 1999.

14. Merriam takes orders from its customers for the metal boxes that it sells, which Aztec manufactures to fill the orders in exchange for a subcontracting fee of approximately 90% of the price Merriam charges its customers. The boxes are sold under the "Merriam" label. Although Merriam is Aztec's primary customer, Aztec does perform manufacturing operations for a small number of customers other than Merriam.

15. Since January 1, 1999, Merriam's operations have been limited to sales, although on its web site *www.merriammfg.com* Merriam holds itself out as in the manufacturing business and as occupying an 80,000–square–foot facility in Middletown.

16. Some of the manufacturing equipment used by Aztec was salvaged from the fire at the Merriam Premises, which Aztec purchased from Merriam. Additionally, Aztec was required to lease a significant amount of equipment.

17. Aztec never undertook any manufacturing operations at the Merriam Premises in Durham, and Merriam has never undertaken any manufacturing operations at the High Street Premises in Middletown.

18. Prior to the creation of Aztec, the members of Aztec were aware of the environmental conditions and potential liabilities of Merriam and Adams with respect to the Merriam Premises.

19. Aztec maintains separate books, records, and bank accounts from Merriam. It files separate tax returns and maintains

a separate payroll. It never agreed to assume the debts or liabilities of Merriam. Merriam and Aztec, however, do share a common mailing address.

## II. The Manufacturing Processes and Use of Cleaning Solvents

20. Durham and Merriam used similar manufacturing processes for the fabrication of metal boxes, which, in general terms, involved the cutting, bending, cleaning, and painting of steel.

21. While there have been changes in the cleaning and painting processes over time, the basic metal box fabrication process at Merriam remained essentially unchanged for the better part of the twentieth century. Merriam purchased flat or cold-rolled steel, stamped and formed it into boxes, cleaned and painted them, and shipped them to customers.

22. Likewise, since 1922, Durham has used a similar manufacturing process.

23. In the manufacturing operations at both Durham and Merriam, the metal boxes had to be cleaned or degreased before being painted. At various times over the years, both companies used chlorinated solvents, such as trichloroethylene ("TCE") and methylene chloride, as cleaning agents. Other non-chlorinated solvents have also been used at various times as paint thinners.

24. Durham has used chlorinated solvents for cleaning and degreasing from approximately 1947 to the present. It began with TCE, then switched to 1,1,1–trichloroethane ("TCA") in 1967, which it continued to use until 1980. Durham also used methylene chloride from 1976 until 1997.

25. As part of its manufacturing operations, Merriam used TCE as its primary parts cleaner from 1940 until 1953. From 1953 to 1978, Merriam cleaned parts using "Oakite," a water-based cleaner that did not contain chlorinated compounds. Mer-riam began using TCE in a small parts washer from 1974 to 1986 and methylene chloride in its larger degreaser from 1978 to 1986. Both washers were converted to TCA in 1986. Merriam used TCA from 1986 to 1993.

26. By the late 1980's, Merriam, like many industrial companies, had identified alternatives to chlorinated solvents. In 1990, it eliminated its small parts washer. In 1993, Merriam replaced its large parts cleaner with a water-based system, thus permanently eliminating the use of chlorinated solvents. Merriam's decision to eliminate the use of chlorinated solvents in its operations eliminated all risk of release of those hazardous substances into the environment.

27. Durham continued to use chlorinated solvents after Merriam had stopped using them and, in fact, still does use chlorinated solvents, although other degreasers are now also used. The continued use of chlorinated solvents allowed Durham to maintain a higher production capacity and to defer costly investments in new equipment.

28. Although the manufacturing operations of Aztec are similar to those of Merriam, Aztec has never used any chlorinated solvents in connection with its manufacturing operations that are at issue in this case.

## III. Waste Disposal and Spills

29. Wastes and hazardous substances have been released at the Merriam Premises and at the Durham Premises. Although most of the solvents used by Merriam and Durham were recovered and taken off the premises, some material passed through the waste water system and was disposed of on site. Other solvent releases may have occurred through the on-site disposal of cooling water and paint waste.

30. At the Merriam Premises, two lagoons were used for the disposal of waste products from approximately 1973 to 1982. The wastes received by the lagoons included, but were not limited to, paint booth wash water and alkaline wash and rinse water, which may have contained volatile organic compounds from the various chlorinated solvents used by Merriam over the years.

31. At the Durham Premises, through the 1980's, Durham discharged well water used for cooling into an unlined holding pond on its property. It also discharged wastewater from its wet paint booths and paint stripping tanks into a ditch on the property, and later to a leaching field. Floor drains in the painting area and near the degreaser also drained into the tank and then into the cooling pond. These drains occasionally collected solvents spilled in connection with use of the degreaser. These disposal areas may have provided pathways for the migration of volatile organic compounds from the chlorinated solvents into the soil and ground water.

32. Additionally, at the Durham Premises, over the years there have been a number of hazardous waste spills, including a spill on June 26, 1984, of an unknown quantity of xylene on the driveway when a 55-gallon drum was punctured by a forklift; and a spill in July of 1995 of 200 gallons of methylene chloride inside the Durham Premises, of which approximately 25 gallons ran out the door into the soil.

## IV. Environmental Investigations and the Parties' Responses

33. The Merriam Premises and the Durham Premises and surrounding area

are located in an area where the ground water is classified as "GA" by the Connecticut Department of Environmental Protection (the "CTDEP"). GA ground water is presumed to be suitable for use as a supply of drinking water without the need for treatment. The area is not served by a public water supply.

34. Environmental investigations at and in the areas of the Merriam Premises and the Durham Premises identified the presence of hazardous substances in the soil and ground water, including but not limited to TCE, tetrachloroethylene, 1,1,1-TCA, 1,2-dichloroethane, and trans-1,2-dichloroethane. The ground water in certain areas between the Merriam Premises and the Durham Premises was found to be impacted by solvents used by both Durham and Merriam.

35. In the early 1980's, the CTDEP discovered solvent contamination at the Merriam Premises and the Durham Premises. Based on the CTDEP's determination that these companies were maintaining a condition which reasonably could be expected to create a source of pollution to the waters of the State, in 1982 the CTDEP ordered both companies to investigate the nature and extent of the ground water, surface water, and soil contamination and to ensure a potable drinking water supply[1] for the residences in the immediate area where the ground water was contaminated. They were also ordered to design and implement long-term water treatment plans or to develop an alternative water supply, and to periodically monitor water quality. To divide the responsibility for residential well monitoring and filtration, the CTDEP selected the geo-

1. "Potable drinking water" means drinking water from an existing water supply for which treatment is provided or an alternative supply, which the Commissioner of Public Health determines does not create an unac-

ceptable risk of injury to the health or safety of those persons using such water as a public or private source of water for drinking or other personal or domestic uses. Conn. Stat. Ann. § 22a-423.

graphical divide of Wallingford Road (Route 68) and Maiden Lane. The Merriam Premises lie to the north of this dividing line, and the Durham Premises to the south.

36. More specifically, on July 12, 1982, the CTDEP issued to Merriam Pollution Abatement Order No. 3299, and on May 12, 1983, Pollution Abatement Order No. 3463, which required Merriam to fully investigate and propose remediation for the contamination caused by the releases at the Merriam Premises. On December 10, 1982, the CTDEP issued to Merriam Water Supply Order No. 3332 (modified on October 19, 1983), which required Merriam to provide a potable supply of drinking water to residences in the vicinity of the Merriam Premises. The CTDEP has since required Merriam to monitor the water at and provide water treatment systems for certain residences in the town of Durham. The number of wells monitored has changed over time.

37. On March 29, 1989, the CTDEP issued to Adams Pollution Abatement Order No. WC4806, which required him to fully investigate the contamination caused by the releases at the Merriam Premises.

38. On February 11, 1982, the CTDEP issued to Durham Pollution Abatement Order No. 3209, which required Durham to fully investigate and propose remediation for the contamination caused by the releases at the Durham Premises. The CTDEP issued to Durham Water Supply Order No. 3334 on December 10, 1982, (modified June 1, 1983, June 28, 1983, and April 4, 1984) requiring Durham to provide a potable supply of drinking water to residences in the vicinity of the Durham Premises. The CTDEP has since required Durham to monitor the water at and provide water treatment systems for 13 residences in the town of Durham.

39. The number of wells monitored by Merriam and Durham has varied over time. Merriam, however, has been required to monitor a greater number of wells than has Durham because, at least in part, there are a greater number of residences located near the Merriam Premises.

40. Durham cooperated with the CTDEP and eventually took some of the steps necessary to comply with the Orders.

41. In 1988, the site currently identified as the "Durham Meadows Superfund Site" was identified by the United States Environmental Protection Agency ("EPA"). It was defined by the contamination located at and emanating from the Merriam and Durham manufacturing facilities and also included the areas between, adjacent to and near the Durham Premises and the Merriam Premises. On October 4, 1989, the Durham Meadows Superfund Site was added to the National Priorities List ("NPL") under CERCLA.

42. In November 1993, the EPA notified Durham and Merriam of their potential liability for the Durham Meadows Superfund Site.

43. Durham was classified by the EPA as a Large Quantity Generator of hazardous waste.

44. Both companies monitored residential well water quality and replaced filters. Durham also implemented remediation efforts at the Durham Premises including, but not limited to, operating a groundwater collection trench and aeration system, operating a multi-phase ground-water and soil vapor extraction system, and capturing affected ground water through the on-going use of its cooling water supply well and aeration system and containing affected ground water through ongoing use of its drinking water supply wells. Contaminant concentrations in off-site wells potentially impacted by the Durham Premises have stabilized or decreased in

recent years. Durham asked the CTDEP on several occasions to reduce the monitoring frequency and the number of homes Durham was required to monitor.

45. Through 1994, Durham used one filter rather than two on the wells that it was monitoring. Merriam, however, installed double filters on each residence as an added health and safety protection against breakthroughs at the first filter. Moreover, solely by virtue of the greater housing density in the area assigned to it, since the 1980's, Merriam has monitored and replaced filters at roughly double the number of homes as has Durham.

46. Throughout the 1980's and early 1990's, Merriam retained several consultants who studied the environmental condition of its premises and proposed remedial designs. By the mid–1990's, Merriam had located certain areas of contamination on its site and authorized its consultants to design a remediation system. Merriam's consultants submitted to the CTDEP at least eight reports, studies, remediation proposals, and work plans, at a cost to Merriam of over $1 million.

47. Durham also hired a consultant to conduct a subsurface investigation of its premises in 1982. Durham did not conduct further investigations on its site until 1993. It submitted a report to the CTDEP in January 1994.

48. Investigations at the Durham Premises confirmed three contaminant source areas: a former solvent storage and handling area, the former wastewater treatment lagoons, and the septic system leach field. These sources encompass an area about 500 feet in diameter on the Durham Premises, compared with an area of contamination on the Merriam Premises near its former loading dock and drum storage area that was approximately 100 feet in diameter.

49. Environmental investigations at the Merriam Premises indicated that contamination from the Merriam Premises had migrated off-site to other portions of the Durham Meadows Superfund Site at concentrations exceeding drinking water standards and/or the EPA maximum contaminant levels. The reports concluded that remediation of contamination at the Merriam Premises was required. Contamination found at the Merriam Premises in the 1980's and early 1990's included TCA identified in soil samples at concentrations as high as 41,375 $\mu$g/kg in the loading dock area, 29,088 $\mu$g/kg in the former drum storage area, and 2,000 $\mu$g/kg in the area between the loading dock and former drum storage area. These levels of TCA exceeded current pollutant mobility criterion ("PMC") of 100 $\mu$/kg. established under the Connecticut Remediation Standard Regulations, Conn. Agencies Regs. §§ 22a–133k–1 through 22a–133k–3, Appendix B.

50. A 1994 U.S. Geological Survey Administrative Report prepared for the EPA on the "Geohydrology and Water Quality of The Durham Center Area, Durham, Connecticut," concluded that

[d]egradation of ground water is widespread and persistent beneath the Durham Center area in the town of Durham, Connecticut. The contaminants are dominantly organic halides, most commonly trichloroethane, 1, 1, 1–trichloroethane, and tetrachloroethene. Less extensive chemical contamination of surface water, soil, and glacial sediments has also been observed. Two manufacturing companies, located at the north and south ends of this largely residential area, are believed to be the principal sources of the organic compounds detected in the ground water. The contamination of water in the bedrock, the primary source of drinking water throughout the area, is the major environmental concern.

(Defs.' Ex. CCC at 1.) The report discussed the "highly complex" geohydrology of the area (*id.* at 1, 88), and stated that "[n]either the details of the ground-water flow paths nor the nature of the aquifer system can be resolved without additional data." (*Id.* at 89.) The report concluded that the transport of dissolved organic halides, which was affected by the structural features of the sedimentary bedrock, was generally to the south and southwest of the purported source areas and that the ground-water flow and transport of the organic compounds were also affected by pumpage from the numerous bedrock wells in the area. (*Id.* at 90.)

51. Merriam and Durham both engaged in extensive negotiations with the EPA over the next several years. Merriam was concerned about its ability to meet all of its demands for past costs, administrative oversight costs, and funding a Remedial Investigation/Feasibility Study ("RI/FS") Work Plan,[2] while remediating its own property and complying with the 1982 CTDEP order. It also expressed its concern that the EPA could change the scope of work at any time and impose stipulated penalties of $25,000 per day for any violation of any provision of the lengthy proposed Administrative Order on Consent. Merriam's concerns were grounded in its actual experience when it had been unable to comply with certain CTDEP mandates and ultimately paid a substantial state fine in the 1980's as a result of an enforcement action brought against it by the CTDEP. Merriam was unable to reach an agreement with the EPA that it believed it would be able to satisfy.

52. Upon terminating negotiations, the EPA sent Merriam letters that any further work Merriam might do on its property may not be accepted by the EPA, and that any such work must not compromise the condition of the property or be inconsistent with the EPA-selected final remedy for the property. Merriam therefore did not undertake the soil vapor extraction remediation system that it had designed.

53. In 1998, Merriam removed an underground storage tank and the surrounding soil. It also scraped the ground to clean off the run-off from the fire. Otherwise, Merriam has not performed any remediation of the soil on the northern portion of the Site.

54. Durham successfully negotiated the terms of an agreement with the EPA that it was financially capable of satisfying. On June 30, 1997, Durham and the EPA entered into an Administrative Order on Consent ("AOC") under §§ 104 and 122(d)(3) of CERCLA, for the preparation and performance of, and reimbursement of oversight costs for certain work described therein, including a RI/FS for the Durham Meadows Superfund Site. The parties' stated objectives in entering into the AOC were (1) to determine the nature and extent of contamination and any threat to the

---

**2.** In carrying out the remedial investigation, the "RI" portion of the work plan, the party must conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment posed by contaminants migrating to the ground water or surface water. 40 C.F.R. § 300.430(d)(4). During the feasibility study, the "FS" portion of the work plan, the party must develop remedial alternatives reflecting the scope and complexity of the remedial action under consideration based on the site.

40 C.F.R. § 300.430(e)(1), (2). Then, the remediation alternatives must be screened in light of their relative effectiveness, implementability and cost. 40 C.F.R. § 300.430(e)(1), (e)(7)(i)-(iii). Finally, a more detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage. 40 C.F.R. § 300.430(e)(9). *See Sealy Connecticut, Inc. v. Litton Industries, Inc.,* 93 F.Supp.2d 177, 183–84 (D.Conn.2000).

public health, welfare or the environment caused by the release or threatened release of hazardous substances, pollutants, or contaminants from the Site by conducting certain studies; and (2) to determine and evaluate alternatives for removal or remedial action, if any, to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants from the Site by conducting a Feasibility Study and/or Engineering Evaluation/Cost Analysis ("EE/CA").

55. The EPA requested Merriam and Adams to enter into this AOC, but they refused to enter into it as then worded. Therefore, the EPA performed the sampling and plant work that was described in the AOC as being performed by Merriam.

56. The AOC required Durham to conduct certain investigations not only at the Durham Premises, but also in the larger area encompassed by the Durham Meadows Superfund Site south of Wallingford Road. In addition, Durham was required to compile and submit to the EPA a unified RI/FS for the entire Durham Meadows Superfund Site, and to pay the EPA oversight costs, except to the extent that those costs were divisible between Durham and Merriam, in which event Durham was not responsible for contamination attributable to Merriam.

57. The investigative data for the northerly portion of the Site was to be provided by the EPA and its contractor. The EPA contracted with a consulting company, Metcalf & Eddy, Inc., to conduct further investigations of the Merriam Premises and the northerly portion of the Site. Metcalf & Eddy initially collected ground-water samples from wells north of Wallingford Road and recently initiated investigations at the Merriam Premises.

58. Between 2000 and 2003, Defendants sought to work out a settlement with the EPA based on Merriam's ability to pay. The EPA would not execute an ability-to-pay agreement with Defendants because Durham objected to it.

59. The EPA has assessed and Durham has paid $350,093.79 in oversight costs, which includes invoices from Metcalf & Eddy for monitoring on the north side of the Site. An additional $11,825.05 in oversight costs has recently been assessed by the EPA. Durham spent approximately $20,000 to $30,000 to prepare the RI/FS Work Plan and Data Report, which encompasses the entire Durham Meadows Superfund Site.

60. Durham has not expended any money specifically earmarked for the investigation of the northerly portion of the Site, and Durham has not expended any costs for the containment, removal or mitigation of any contamination resulting from actions of the Defendants. Durham has, however, paid oversight costs that include the northern portion of the Site to the extent that the EPA was not able to allocate its costs solely to one side or the other. Durham has also incurred costs for preparation of the RI/FS Work Plan that relate to the entire Site. Durham is not seeking to recover the amounts that it has expended for ground-water monitoring or for water filters. Additionally, it is not seeking to recover for contamination on its own premises caused solely by its own acts.

61. The nature of the final remedy that may be selected by the EPA at the end of the Superfund process, and the cost of that remedy are not yet known.

### CONCLUSIONS OF LAW

1. This action arises under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), and under the Connecticut Environmental Protection

Act, Conn. Gen.Stat. § 22a–14, *et seq.* ("CEPA").

2. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b) and over the state-law claims pursuant to 28 U.S.C. § 1367.

3. Durham seeks to recover response costs from Defendants under §§ 107(a) and 113(f) of CERCLA, declaratory and equitable relief, attorneys' fees and costs under CEPA, Conn. Gen.Stat. § 22a–14, *et seq.*, and reimbursement for containment or removal costs under Conn. Gen.Stat. § 22a–452. Durham also seeks a declaratory judgment that Defendants are responsible for the existence of hazardous substances at, on or under the Merriam Premises and other portions of the Durham Meadows Superfund Site and are liable for any future monitoring costs and other necessary costs of response pursuant to § 107(a) of CERCLA.

## I. CERCLA Liability—Counts I and II

4. "CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), provides two legal avenues by which a private party can recoup some or all of the costs associated with an environmental cleanup: a cost recovery action under § 107(a) [3] and a contribution action under § 113(f)(1)." [4] *Bedford Affiliates v. Sills*, 156 F.3d 416, 423 (2d Cir.1998) (footnotes added).

5. Section 107(a) is a strict liability statute, which holds four classes of "potentially responsible persons" ("PRPs"), including former owners or operators of "facilities" where hazardous substances have been deposited, stored, or disposed of, jointly and severally liable for necessary cleanup costs incurred by the Government or any other person consistent with the national contingency plan. 42 U.S.C. § 9607(a). "Where the environmental harm is indivisible, multiple responsible persons will be jointly and severally liable for cleanup costs." *Bedford Affiliates*, 156 F.3d at 423.

6. Section 113(f)(1) of CERCLA, on the other hand, is a contribution statute, which allows a PRP to seek contribution from other PRPs for their respective shares of the environmental cleanup costs. Under § 113(f)(1), the Court may allocate response costs among liable parties using such equitable factors as the Court determines are appropriate. 42 U.S.C. § 9613(f)(1); *Goodrich Corp. v. Town of*

**3.** Section 107(a) of CERCLA provides in relevant part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
> (1) the owner and operator of a . . . facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . .
> (4) . . . from which there is a release . . . of a hazardous substance, *shall be liable* for—
> (A) all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release;
> (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(emphasis added).

**4.** Section 113(f)(1), 42 U.S.C. § 9613(f)(1), provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title. . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. . . .

*Middlebury,* 311 F.3d 154, 168 (2d Cir. 2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 2577, 156 L.Ed.2d 621 (2003).

■ 7. In order to establish a prima facie case under either § 107 or § 113(f)(1) of CERCLA, a plaintiff must demonstrate the following elements: (1) the defendant falls within one of the four categories of responsible parties; (2) the site qualifies as a "facility" as defined in 42 U.S.C. § 9601(9); (3) there was a release or threatened release of a hazardous substance at the facility; (4) the plaintiff incurred response costs as a result of the release or threatened release; and (5) the response costs incurred are in conformity with the National Contingency Plan ("NCP"). *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), *decision clarified on denial of reh'g,* 112 F.3d 88 (2d Cir.1997), *cert. denied,* 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 602–03 (2d Cir.1999).

8. Merriam and Adams are "persons" as that term is defined in § 101(21) of CERCLA, 42 U.S.C. § 9601(21).

9. Defendant Allan E. Adams is an "owner" because he owns the Merriam Premises and owned it at the time of the release of hazardous substances. 42 U.S.C. § 9607(a).

10. Defendant Merriam was an "operator" at the time of disposal of hazardous substances because it operated the Merriam facility and the manufacturing and disposal activities conducted thereon. *Id.*

11. Defendants Adams and Merriam are "responsible parties" under CERCLA because they owned or operated the Merriam Facility at the time of the disposal of hazardous substances. *Id.; see Prisco,* 168 F.3d at 603; *Bello v. Barden Corp.,* 180 F.Supp.2d 300, 308 (D.Conn.2002).

12. Defendant Merriam arranged for the disposal of hazardous substances at the Merriam Premises because, through its officers and agents, it made the ultimate decisions regarding how the hazardous substances would be disposed of, and made an affirmative decision not to remove hazardous substances after becoming aware of the contamination problem.

13. Defendants Merriam and Adams have been identified by the EPA as "responsible parties" under CERCLA for the Durham Meadows Superfund Site.

14. A "facility" is defined under CERCLA as "(A) any building, structure, . . . equipment, . . . well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, . . . or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9).

15. The Merriam Premises is a "facility" under CERCLA.

16. The Durham Premises is a "facility" under CERCLA.

17. Under CERCLA, a "release" is defined as including "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

18. The regulations promulgated under CERCLA include trichloroethylene, tetrachloroethylene, methylene chloride, 1,1,1–trichloroethane, 1,2–dichloroethane, and trans–1,2–dichloroethane as "hazardous substances." 40 C.F.R. Table 302.4.

■ 19. The quantity or concentration of hazardous substances disposed of is not a factor in imposing liability. Even minimal amounts of pollution will render a

responsible person liable under CERCLA. *B.F. Goodrich,* 99 F.3d at 515.

20. The actions of Defendants Merriam and Adams caused a "release" of hazardous substances into the environment.

21. The actions of Durham caused a "release" of hazardous substances into the environment.

22. Durham has incurred, and will continue to incur, response costs as a result of the release of hazardous substances at the Merriam Premises. The amount of future response costs cannot be calculated at this time.

■ 23. The response costs already incurred were reasonable and necessary because Durham was required to conduct investigations and to prepare a work plan for the remediation of contamination at the Durham Meadows Superfund Site, including contamination caused by the release of hazardous substances at the Merriam Premises. Additionally, Durham was required to reimburse the EPA for response costs that the EPA incurred at the Durham Meadows Superfund Site.

24. These response costs were incurred in compliance with the terms of the AOC, which Durham entered into with the EPA. "Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii). The AOC, paragraph 5, specifically provides: "The activities conducted under this Order are subject to approval or modification by EPA and shall provide all information necessary for the completion of the RI/FS and the issuance of a Record of Decision and/or an EE/CA and the issuance of an Action Memorandum, all consistent with CERCLA §§ 104, 121, and 122, and the National Contingency Plan (NCP), 40 C.F.R. Part 300."

25. The response costs incurred by Durham were consistent with the NCP.

### A. Liability under CERCLA § 107

■ 26. A PRP cannot bring an action under § 107(a) against another PRP unless the plaintiff can establish by a preponderance of the evidence that the release of hazardous substances and damages resulting therefrom were caused "solely" by an act of God, an act of war, an act or omission of a third party (with certain exceptions set forth in the statute), or any combination thereof. 42 U.S.C. § 9607(b); *Prisco,* 168 F.3d at 603; *Bedford Affiliates,* 156 F.3d at 424. The Second Circuit has expressly declined to allow a PRP to elect recovery under the two statutes, § 107(a) and § 113(f)(1), since to do so would render § 113(f)(1) meaningless. *Bedford Affiliates,* 156 F.3d at 424. Instead, a PRP's right of recovery of that portion of response costs exceeding its equitable share must be brought as a claim for contribution under § 113(f)(1). *Id.*

■ 27. In this case, the evidence established unequivocally that the use and discharge of hazardous chlorinated solvents by both Durham and Merriam in their manufacturing processes impacted the Durham Meadows Superfund Site and both Durham and Merriam are PRPs as to the overall site. Under the facts of this case, the only way in which Durham could avoid joint and several liability is if it proved that the environmental harm at the Durham Meadows Superfund Site was divisible. In such a case, if it proved that it was an "innocent party" as to one portion of the divisible Site and that the release on that portion of the Site was caused solely by the acts of a third party, i.e., Merriam, it could recover from Merriam for any costs it incurred that were associated with that portion of the Site. *See In re Bell Petroleum Services, Inc.,* 3 F.3d 889, 896

(5th Cir.1993); *Rumpke of Indiana, Inc. v. Cummins Engine Co.,* 107 F.3d 1235, 1238–41 (7th Cir.1997). The "'divisibility of harm inquiry . . . is guided not by equity . . . but by principles of causation alone.'" *Goodrich Corp.,* 311 F.3d at 170 n. 16 (quoting *United States v. Hercules, Inc.,* 247 F.3d 706, 718 (8th Cir.), *cert. denied,* 534 U.S. 1065, 122 S.Ct. 665, 151 L.Ed.2d 579 (2001)). Proving divisibility is a "very difficult proposition," *Hercules,* 247 F.3d at 717, requiring concrete and specific evidence of causation of separate and distinct harms to the environment. *Id.*

28. The aggregation of two separate parcels into one NPL site by the EPA, as was done with the Merriam Premises and the Durham Premises, is not determinative of the question of whether they are separate facilities. Likewise, the CTDEP's division of the overall site at Wallingford Road, which was a convenient dividing line for the purpose of allocating responsibility for the monitoring of residential wells between Durham and Merriam, is not determinative.

29. The evidence established that the nature of the ground-water flow at the Durham Meadows Superfund Site is complex due in part to the highly fractured underlying bedrock. Additionally, the ground-water flow is highly influenced by ground-water pumping by Durham, Merriam, and the many residential wells in the area. Because of the complex geohydrology of the area, the EPA has not been able to determine, with a reasonable level of certainty, that a certain portion of the ground-water plume[5] Durham's responsibility and a certain portion was Merriam's responsibility. Similarly, Merriam's expert concluded, based on data concerning the influence of well-pumping on the

ground-water plumes as well as U.S. Geological Survey data concerning the underground bedrock structure and fractures, that a hydraulic interconnection exists between the plumes. Although Durham's expert disagreed with this conclusion, his opinion was based in part on the CTDEP's and the EPA's historical division of the Site, which was a division of convenience and was not supported by scientific evidence. The other evidence is not sufficiently persuasive for the Court to conclude that the plumes are divisible for liability purposes.

■ 30. Based on the experts' testimony and reports, as well as the EPA reports, the Court concludes that Durham has failed to carry its difficult burden of proving that there were separate and distinct plumes of ground-water contamination in the Durham Meadows Superfund Site, such that the Site is divisible for liability purposes under § 107(a) of CERCLA.

31. Therefore, because the Durham Meadows Superfund Site cannot be divided in such a way that Durham was an "innocent party" with respect to a portion of the Site, the Court holds that Durham, as a PRP, is not entitled to recover against any of the Defendants under § 107(a). *See Axel Johnson, Inc. v. Carroll Carolina Oil Co.,* 191 F.3d 409, 415 (4th Cir.1999).

**B. Liability under CERCLA § 113(f)(1)**

■ 32. A plaintiff, who is a PRP, can pursue a contribution action against another PRP under § 113(f)(1) of CERCLA to recover the portion of costs exceeding the plaintiff's equitable share of the overall liability, even though the plaintiff is pre-

---

**5.** "Ground-water plume" is defined by the Connecticut Agencies Regulations § 22a–133k–1(24) as "ground water which has been polluted by a release and in which ground

water one or more substances from such release is present at a concentration above the analytical detection limit."

cluded from recovering under § 107(a) of CERCLA. *Bedford Affiliates,* 156 F.3d at 424. Before a court may award contribution under § 113(f)(1), the court must first find that the defendant is liable under § 107(a). The court must then determine the proper allocation of response costs in an equitable manner. The burden of proof for both of these requirements rests with Durham, the party seeking contribution. *Goodrich Corp.,* 311 F.3d at 168.

■ 33. A plaintiff need not prove that a specific defendant's waste caused a specific incurrence of clean-up costs. *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir.1993).

■ 34. CERCLA further permits a declaratory judgment allocating future response costs between PRPs. 42 U.S.C. § 9613(g)(2); *see Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 91, 92 (2d Cir. 2000) (holding that the proper remedy for future response costs is not a present lump-sum payment of anticipated expenses but instead a declaratory judgment award dividing future response costs among PRPs); *In re Dant & Russell, Inc.,* 951 F.2d 246, 249–50 (9th Cir.1991) (holding that §§ 107 and 113 of CERCLA "envision that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job."). In order for a party to be entitled to a declaratory judgment that allocates future liability, that party must prove that both the plaintiff and defendant are liable for the response costs and the percentage of that total liability that should be allocated to each party, and a likelihood that the plaintiff will be required to pay more than its share of liability. *United States v. Davis,* 31 F.Supp.2d 45, 63 (D.R.I.1998), *aff'd,* 261 F.3d 1 (1st Cir.2001).

35. Section 113(f)(1) does not limit the courts to a particular list of factors to consider in allocating costs between responsible parties. "The statute's expansive language instead affords a district court broad discretion to balance the equities in the interests of justice." *Bedford Affiliates,* 156 F.3d at 429; *see also Goodrich Corp.,* 311 F.3d at 170 (holding that the allocation of response costs under § 113(f) is an "equitable determination based on the district court's discretionary selection of the appropriate equitable factors in a given case"); *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.,* 240 F.3d 534, 549 (6th Cir.2001) (holding that "[t]he apportionment of CERCLA liability under § 113(f) among various responsible parties is an equitable undertaking within the broad discretion of the district court").

■ 36. Equitable factors that may be considered include the relative volumes and toxicity of the hazardous substances disposed of by each party, the form of the hazardous substances—*e.g.,* liquid or solid, the releasability and mobility of the hazardous substances, the relative cleanup costs incurred as a result of these releases, the degree of care exercised by each party, the ability of each party to demonstrate that its contribution to a discharge, release or disposal can be distinguished, the degree of cooperation of each party with federal, state, or local officials to prevent any harm to the public health or the environment. *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1206 (2d Cir.1992); *Goodrich Corp.,* 311 F.3d at 166; *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994).

■ 37. After reviewing all of the evidence in this case, with particular attention to the expert witnesses' reports and testimony and the investigative reports of the CTDEP and the EPA, the Court concludes

that to date Durham has paid more than its fair share of response and oversight costs and that it is entitled to contribution from Merriam under § 113(f) of CERCLA. In determining the amount of contribution to which Durham is entitled, the Court has considered the following factors:

a. Both parties used the same or similar cleaning products and generated the same types of wastes. Durham, however, was a much larger company, with sales approximately ten times those of Merriam, and with approximately five times as many employees.

b. Durham used chlorinated solvents from 1947 to the present, whereas Merriam used them from 1940 to 1953 and from 1974 to 1993. Merriam discontinued the use of chlorinated solvents in 1993. Thus, Durham has a history of using chlorinated solvents for a longer period of time, utilizing higher quantities of chlorinated solvents, and continuing the use of chlorinated solvents with the attendant risk of additional releases in the future. Additionally, the contaminated area at the Durham Premises is five times larger than the contaminated area at the Merriam Premises.

c. In 1982, both Merriam and Durham were ordered by the CTDEP to conduct investigations of the degree and extent of contamination on their respective properties. Both companies prepared reports, both identified soil and/or ground-water contamination on both premises and identified suspected source areas. Additionally, in response to the CTDEP's water orders, since the early 1980's, both companies have monitored residential drinking water and installed filters at the residences on their respective sides of the Site. The Court finds that the parties' cooperation with the CTDEP in the early stages of this matter favors neither party.

d. The designation of a Superfund site carries with it requirements for strict adherence to certain investigative and reporting requirements. In that regard, Durham entered into an AOC with the EPA, which Merriam refused to join. The recalcitrance of Merriam contrasts sharply with Durham's cooperation with the EPA and Durham's expenditure of response costs. These equitable factors weigh in favor of Durham.

e. Durham's expert recommended an allocation of costs based on the number of off-site wells currently monitored by each party. The Court concludes that such an allocation is inequitable and is based on the arbitrary division of the Site by the CTDEP over twenty years ago. The fact that Merriam has more residential wells to monitor is a function of the higher density of housing in proximity to the Merriam Premises and is not a function of greater contamination by Merriam.

f. Durham has undertaken certain remedial action on its own Premises, including a multiphase extraction system and the pumping of a cooling water well to remove chlorinated compounds from the bedrock aquifer below the facility. Although Merriam designed a soil vapor extraction system, it never actually implemented it once negotiations with the EPA broke down over the AOC. Both parties, however, have invested significant amounts of money and resources into the investigation of the environmental contamination at their respective premises.

g. There was evidence that Durham's well-pumping may have exacerbated the contamination by drawing the plume downward into the bedrock and laterally toward the south.

h. Most of the costs incurred to date by Durham relate to the Durham Premises, although the oversight costs and RI/FS work plan and data report cover the entire site.

38. EPA oversight costs fall within the definition of "removal" and "remedial" costs. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985).

39. The Court finds that to date Durham has incurred response costs of $386,918.84, in responding to the release of hazardous substances at the Durham Meadows Superfund Site.

40. After carefully reviewing all of the evidence in this case, the Court finds that an equitable apportionment of those response costs would be 65% to Durham and 35% to the Merriam Defendants, as more fully discussed below, such that Durham is entitle to recover $135,421.59.

41. The liability of Defendant Adams for a portion of the response costs is premised on his capacity as the owner of the Merriam Premises on which discharges took place, not on a theory of piercing the corporate view or an *alter ego* theory. Although he was President of Merriam and the sole shareholder, there was no evidence that he exercised domination or control over the corporation and that this control was the cause of the contamination. *See Bedford Affiliates*, 156 F.3d at 431. There also is no evidence that he was personally involved in the use, handling or disposal of hazardous substances. Accordingly, of the total response costs incurred to date by Durham, the Court allocates 30% to Merriam and 5% to Adams. *See Id.* (allocating a 5% share of liability to the owner of the property, who exercised no control over his tenants and bore little responsibility for the release of hazardous substances); *see also Waste Management of Alameda County, Inc. v. East Bay Reg'l Park Dist.*, 135 F.Supp.2d 1071, 1099 (N.D.Cal.2001) (allocating only 5% of the total liability to the park district as owner). Thus, Durham is entitled to recover $116,075.65 from Merriam and $19,345.94 from Adams.

## II. Liability under CEPA

42. The CEPA, Conn. Gen.Stat. § 22a–16, provides in relevant part:

[A]ny person, partnership, corporation, association, organization or other legal entity may maintain an action ... for declaratory and equitable relief against ... any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction....

43. Durham has standing to bring an action for declaratory relief under Conn. Gen.Stat. § 22a–16. *See Bombero v. Planning & Zoning Comm'n of Trumbull,* 40 Conn.App. 75, 88, 669 A.2d 598 (1996) (holding that any member of the general public can initiate an action "to raise issues involving the public trust in air, water, or other natural resources of the state").

44. The soil and ground water at, around, and near the Durham Meadows Superfund Site are natural resources under CEPA. *See* Conn. Gen.Stat. § 22a–15 (providing that "there is a public trust in the air, water, and other natural resources of the state of Connecticut" and that it is "in the public interest to provide all persons with an adequate remedy to protect the air, water, and other natural resources from unreasonable pollution, impairment or destruction").

45. Defendant Merriam disposed of contaminants at, on or under the Merriam Premises.

46. Certain of the contaminants disposed of by Merriam at, on or under the Merriam Premises migrated from the Merriam Premises and polluted, impaired, or destroyed soil and/or ground water at, on or under the Durham Meadows Superfund Site. Thus, the conduct of Merriam, "acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or destroy the public trust in the air, water or other natural resources of the state." Conn. Gen.Stat. § 22a–17.

47. The Remediation Standard Regulations, adopted by the Connecticut Department of Environmental Protection, commonly know as "RSRs," Conn. Agencies Regs. §§ 22a–133k–1 through 22a–133k–3, set forth criteria for concentrations of contaminants in soil, surface water, and ground water above which the State has determined there is a threat to human health and/or the environment.

48. The discharge, release or disposal of contaminants exceeding the criteria set forth in the RSRs is prima facie evidence of unreasonable pollution, impairment or destruction of the air, water or other natural resources of the State.

49. Merriam has discharged or released contaminants into the soil and/or ground water at concentrations exceeding the RSR criteria, thus causing unreasonable pollution, impairment and destruction of soil and water, which are valuable natural resources of the State.

50. Merriam has not adequately mitigated the pollution, impairment or destruction of the soil and ground water at the Durham Meadows Superfund Site.

51. As a result of the contaminants discharged, released on disposed of at, on, or under the Merriam Premises by Merriam and its failure to properly mitigate the pollution, impairment or destruction of the soil and/or ground water at the Durham Meadows Superfund Site, Durham would be entitled to a declaratory judgment under Conn. Gen.Stat. § 22a–16 that Defendant Merriam is liable for 30% of any future monitoring costs, EPA oversight costs, and necessary response costs incurred by Durham that relate to the Durham Meadows Superfund Site, which are not attributable solely to the release of hazardous substances by Durham or that are not attributable to cleanup of the soil, ground water, and/or surface water located at, on, or under the Durham Premises, or the well-monitoring and/or filters for the residential wells for which Durham is responsible under the Orders of the CTDEP. Likewise, for the reasons discussed above, Adams, as the owner of the Merriam Premises, would be personally liable for 5% of such costs.

52. However, for the reasons discussed in Section V, B, below, these claims must be dismissed as barred by the State statute of limitations.

### III. Indemnification Under Conn. Gen. Stat. § 22a–452(a)

53. The response costs incurred by Durham may also be recoverable under Conn. Gen.Stat. § 22a–452(a). *Sealy Connecticut*, 93 F.Supp.2d at 196. Connecticut General Statutes § 22a–452(a) provides:

> Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal, or mitigation, if such oil or petroleum or chemical liquids or solid, liquid or gaseous

products or hazardous wastes pollution or contamination or other emergency *resulted from the negligence or other actions* of such person, firm or corporation. When such pollution or contamination or emergency results from the joint negligence or other actions of two or more persons, firms or corporations, each shall be liable to the others for a pro rata share of the costs of containing, and removing or otherwise mitigating the effects of the same and for all damage caused thereby.

(Emphasis added).

54. Unlike CERCLA's strict liability standard, Conn. Gen.Stat. § 22a–452(a) requires a showing of culpability and not merely causation. *Connecticut Resources Recovery Auth. v. Refuse Gardens, Inc.*, 229 Conn. 455, 457–58, 642 A.2d 697 (1994); *Schiavone v. Pearce*, 79 F.3d 248, 256 (2d Cir.1996). Under this statute, Durham must demonstrate that Merriam or Adams acted negligently and that their negligence was the cause of the contamination. However, like CERCLA, the Connecticut statute is remedial legislation whose language should be construed liberally to effectuate its purpose. *Schiavone*, 79 F.3d at 256.

55. A person or entity is liable under Conn. Gen.Stat. § 22a–452(a) for the reasonable costs of mitigating environmental contamination caused by the negligence or other actions of such person or entity. *Connecticut Resources*, 229 Conn. at 456–57, 642 A.2d 697.

56. The Connecticut Supreme Court has held that the "clear purpose of this provision is to encourage parties to pay for remediation by providing them with an opportunity to recoup at least some of their remediation costs from others who are also found to be responsible for the contamination." *Knight v. F.L. Roberts & Co.*, 241 Conn. 466, 475, 696 A.2d 1249 (1997).

57. This Court has previously ruled that Conn. Gen.Stat. § 22a–452(a) is not pre-empted by CERCLA. *Durham Mfg. Co. v. Merriam Mfg. Co.*, 128 F.Supp.2d 97, 102–03 (D.Conn.2001). In light of the liability standard of Conn. Gen.Stat. § 22a–452(a), allowing Durham to proceed under state law and CERCLA would not defeat or impede any purpose or objective of CERCLA. *See Id.*

58. In order for a plaintiff to be able to bring a claim under Conn. Gen. Stat. § 22a–452, the remediation must have already taken place and the plaintiff must have expended funds for such remediation. *Calabrese v. McHugh*, 170 F.Supp.2d 243, 260 (D.Conn.2001) (Goettel, J.). The reason for this is that liability attaches not upon the act of polluting but upon the act of remediation of that pollution by another. *Cadlerock Properties Joint Venture, L.P. v. Schilberg*, No. CV9969263S, 2001 WL 950233, at *1 (Conn.Super.Ct. July 17, 2001).

59. Additionally, under Conn. Gen.Stat. § 22a–452, a plaintiff is only entitled to recover the costs it expends in remediating contamination caused by another party; it cannot recover costs that it spent to remediate its own contamination.

60. The materials released at, on, or under the Merriam Premises contained chemical liquids and/or hazardous wastes.

61. Defendant Merriam was negligent or otherwise culpable in failing to properly manage chemical liquids and/or hazardous wastes, in failing to take proper and effective precautions to contain the releases of chemical liquids and/or hazardous wastes at the Merriam Premises, and in failing to adequately test and remediate any such releases.

62. Disposing and/or releasing of these materials at the Merriam Facility by Merriam caused their discharge, spillage, loss,

seepage, and/or filtrations and resulted in pollution, contamination, or other emergency.

63. The costs incurred to date by Durham in addressing the conditions caused by the discharge of these chemical liquids and/or hazardous wastes from the Merriam Premises have exceeded $50,000, and Durham will continue to incur costs in addressing the conditions at, on, under or emanating from the Merriam Premises, which costs cannot be reasonably estimated at this time.

64. The costs incurred by Durham that the Court found reasonable and necessary for CERCLA purposes are also reasonable and necessary for state statutory purposes. These costs can be recovered under the state statute against those parties found liable to the plaintiff by the Court. *Sealy Connecticut,* 93 F.Supp.2d at 196.

65. Durham has conceded that it cannot recover damages under Conn. Gen. Stat. § 22a–452 that are also recoverable under CERCLA, *see Bedford Affiliates,* 156 F.3d at 426; *Shore Realty,* 759 F.2d at 1041, and Durham has not sought to recover under state law for any response costs that have been incurred that cannot be recovered under CERCLA.

66. To the extent that Durham incurs future response costs, these also have been awarded under CERCLA § 113(f)(1) and a declaratory judgment has been entered with respect to Durham's claims under CERCLA § 113(f)(1). *See Sealy Connecticut,* 93 F.Supp.2d at 196.

67. Durham has failed to prove culpability or negligence on the part of Adams with respect to the contamination at issue. Therefore, Durham's claims under Conn. Gen.Stat. § 22a–452 against Adams are dismissed. *See Schiavone,* 79 F.3d at 256.

68. However, for the reasons discussed in Section V, B, below, this Court finds that Durham's claims against Merriam under Conn. Gen.Stat. § 22a–452 are barred by the State statute of limitations and will be dismissed.

## IV. Successor Liability of Aztec

69. Durham claims that Defendant Aztec, d/b/a American Metal Crafters, is liable based on a theory of successor liability under CERCLA for any response costs for which Merriam and/or Adams are responsible.

70. Federal common law governs the issue of successor liability under CERCLA. *B.F. Goodrich,* 99 F.3d at 518, *as clarified on denial of reh'g,* 112 F.3d at 90.

71. The Second Circuit has held that CERCLA imposes successor liability based on the plain language of the statute as well as its broad remedial purpose. *Id.* at 518–19. The test for successor liability under CERCLA is the "continuity of enterprise" or "substantial continuity" test. *Id.* at 519.

72. The following factors may be considered in determining whether successor liability under CERCLA should apply to hold a person or entity liable for the obligations of a predecessor: retention of the same employees, retention of the same supervisory personnel, retention of the same production facilities, production of the same products, retention of the same name, continuity of assets, continuity of general business operations, and whether the successor holds itself out as a continuation of the previous enterprise. *Kleen Laundry & Dry Cleaning Services, Inc. v. Total Waste Management, Inc.,* 867 F.Supp. 1136, 1140 (D.N.H.1994).

73. After applying these factors, the Court finds that Aztec is not a successor to Merriam under the "continuity of enterprise" or "substantial continuity" theory. Merriam continues to exist as a legal

and viable entity. Although Aztec was formed by certain Merriam supervisory employees after the fire that destroyed most of Merriam's manufacturing capabilities, there were sound reasons for the formation of Aztec. There was no evidence that would establish that the formation of Aztec was done for the purpose of avoiding environmental liabilities. Aztec's manufacturing operations are carried out at a location different than that used by Merriam. Although Aztec employs a number of former Merriam employees and supervisors, it did not retain all of Merriam's former employees or supervisors. Aztec's business is also different from that of Merriam. Aztec is solely a manufacturing concern, whereas Merriam was formerly in manufacturing and sales, and is now just in sales. Neither holds itself out as the other, although Merriam does continue to represent that it is in the manufacturing business on its web site. Aztec has customers other than Merriam, albeit relatively few in number. Aztec maintains separate books and records, bank accounts, and payroll records.

74. Aztec has been sued solely in its capacity as the corporate successor to Merriam. Because the Court finds that Aztec is not liable under CERCLA under a "substantial continuity" or "continuity of enterprise" theory, all CERCLA claims against Aztec are hereby dismissed.

75. As to Durham's pendent state-law claims against Aztec, state law governs the issue of whether Aztec may be held liable for the obligations of Merriam and Adams. *Calabrese*, 170 F.Supp.2d at 253. Durham maintains that Connecticut courts would apply the "continuity of enterprise" test, citing *A.G. Associates of Newington Britain v. Parafati*, No. CVN0041808NE, 2002 WL 1162890 (Conn.Super.Ct. Apr.11, 2002). Defendants, on the other hand, maintain that Connecticut courts would apply the stricter "identity" or "instrumen-

tality" test, citing *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.*, 187 Conn. 544, 556, 447 A.2d 406 (1982) (holding that Connecticut courts look to the "identity" or "instrumentality" test to determine whether one corporate entity can properly be held responsible for the obligations of another corporate entity). Defendants maintain that Durham cannot successfully shoulder its burden of demonstrating that Aztec was so dominated and controlled by Merriam that it lacked a separate existence and that Aztec was used to commit a wrongdoing upon Durham or that Aztec was a proximate cause of harm to Durham. We need not resolve this disagreement for even under the more lenient "substantial continuity" test, we have found that Aztec is not liable as a successor to Merriam or Adams.

76. Accordingly, the Court hereby dismisses Durham's state-law claims against Aztec.

77. Therefore, because the Court holds that Aztec is not liable under a successor liability theory, all claims of Durham against Aztec are dismissed and judgment shall enter in favor of Aztec.

## V. *Statute of Limitations*

### A. *Durham's CERCLA Claims*

78. Section 113(g)(3) of CERCLA, entitled "Contribution," sets forth the applicable statute of limitations for contribution actions under § 113(f)(1).

(3) *Contribution*

No action for contribution for any response costs or damages may be commenced more than 3 years after—

(A) the date of judgment in any action under this chapter for recovery of such costs or damages, or

(B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or

9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.
42 U.S.C. § 9613(g)(3); *see Bedford Affiliates,* 156 F.3d at 424.

79. None of the triggering events in CERCLA § 113(g)(3) has occurred.

80. Defendants maintain that where none of the triggering events has occurred, the Court should apply the limitations periods in CERCLA § 113(g)(2) applicable to removal and/or remedial cost recovery action under CERCLA § 107. *See Sun Company, Inc. v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1192 (10th Cir.1997), *cert. denied,* 522 U.S. 1113, 118 S.Ct. 1045, 140 L.Ed.2d 110 (1998) (holding that where none of the events for accrual of a § 113(f)(1) contribution claim can arise because a PRP has incurred response costs based on its agreement to remediate in accordance with a state agency's administrative order, the relevant period of limitations and accrual is provided in § 113(g)(2). The court found that under such circumstances, the contribution action becomes the "initial action" for cost recovery under CERCLA § 107, thus bringing such action within § 113(g)(2), applicable to "initial actions for recovery of the costs referred to in [§ 107].").

81. Relying on *W.R. Grace & Co. v. Zotos International, Inc.,* No. 98–CV–838S(F), 2000 WL 1843282 (W.D.N.Y. Nov.2, 2000), Durham asserts that this approach has been rejected by a district court in the Second Circuit and urges this Court to do likewise. The court in *W.R. Grace* concluded that the court in *Sun Company* overlooked the plain language of § 113(g)(2), which sets forth the limitations periods applicable to an initial "removal action" and to an initial "remedial action" for the recovery of costs under § 107. *W.R. Grace,* 2000 WL 1843282, at *5. The court held that a contribution ac-

tion filed under § 113(f)(1) was neither; rather, it was an action for equitable apportionment of response costs already incurred by a PRP, who was unable to seek relief under § 107. *Id.* To accept the holding of the Tenth Circuit in *Sun Company,* the *W.R. Grace* court reasoned, would result in two separate statute of limitations periods and accrual mechanisms for CERCLA contribution actions. *Id.* "If a gap exists in the statute of limitations for CERCLA actions under § 113(f)(1), it is one to be resolved by Congress." *Id.; see also Reichhold Chemicals, Inc. v. Textron, Inc.,* 888 F.Supp. 1116, 1125 (N.D.Fla. 1995) (refusing to borrow another statute of limitations where no triggering event under § 113(g)(3) had occurred or was likely to occur); *Gould Inc. v. A & M Battery and Tire Service,* 901 F.Supp. 906, 914 (M.D.Pa.1995) (holding that plaintiff's entering into a consent agreement with the EPA did not trigger the running of the statute of limitations under § 113(g)(3) for purposes of a § 113(f)(1) contribution action, and further distinguishing a § 113(f)(1) contribution action from a cost recovery action to which the limitations periods of § 113(g)(2) would apply), *rev'd on other grounds,* 232 F.3d 162 (3d Cir. 2000); *but see United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 103 (1st Cir.1994) (applying the three-year limitations period of § 113(g)(3) to a contribution action under § 113(f)(1) and holding that the cause of action accrued upon entry of the consent decree), *cert. denied,* 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). The Second Circuit has not addressed this issue.

82. This Court declines to read into the plain language of § 113(g)(3) an alternative statute of limitations applicable to actions under § 113(f)(1) where none of the triggering events of § 113(g)(3) has occurred. To do so would defeat the underlying purpose of § 113(f)(1), which allows a PRP, such as Durham, to obtain

contribution from other PRPs for response costs that exceed its equitable share of costs. Additionally, invoking the limitations periods of § 113(g)(2) could create a disincentive for PRPs to cooperate voluntarily with the EPA or state environmental agencies if their contribution claims against other PRPs would be time-barred by virtue of the running of the limitations periods in § 113(g)(2). *See generally Bedford Affiliates*, 156 F.3d at 426 (discussing the statutory settlement scheme of § 113(f), designed to aid the expeditious resolution of environmental claims, and noting the statutory incentives for PRPs to settle, including protection from contribution actions, potentially favorable settlement terms, and the ability to seek contribution from other defendants); *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 936 (8th Cir.1995) (discussing the goals of the contribution provisions of CERCLA and rejecting an interpretation that would frustrate those goals by providing "a disincentive for polluters to act quickly and aggressively to remedy the harm they have done in hopes that someone else will stumble upon their creation and be forced to bear the burden rightfully belonging to the original polluter"); *Aviall Servs., Inc. v. Cooper Indus., Inc.*, 312 F.3d 677, 689 n. 21 (5th Cir.2002) (discussing contribution actions brought under § 113(f)(1) by PRPs that have entered into agreements with the EPA or state agencies), *cert. granted,*

2004 WL 42543, 71 U.S.L.W. 3552, —— U.S. ——, 124 S.Ct. 981, —— L.Ed.2d —— (2003).

83. Here, Durham entered into the AOC with the EPA in June of 1997, which led its incurring the costs for which it now seeks contribution. It was not until Merriam refused to participate in the AOC that Durham could have known that it would incur more than its fair share of response costs for which it now seeks contribution from Merriam. This law suit was filed in 1999, two years after the AOC was signed.

84. The Court finds that Durham's § 113(f)(1) contribution claim was timely filed and is not barred by CERCLA's statute of limitations.

### B. Durham's State–Law Claims

85. Defendants have also asserted as an affirmative defense that Durham's state-law claims under Conn. Gen.Stat. § 22a–16 and § 22a–452 are barred by the applicable state statute of limitations. Defendants have raised three possible statute of limitations that could apply to Durham's state-law claims: (i) Conn. Gen.Stat. § 52–577,[6] the three-year statute of limitations applicable to tort actions; (ii) Conn. Gen. Stat. § 52–584,[7] the two-year statute of limitations applicable to injuries to real or personal property caused by negligence or reckless or wanton misconduct; and (iii) Conn. Gen.Stat. § 52–577c(b),[8] the two-

---

**6.** Section 52–577, Conn. Gen.Stat., provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

**7.** Section 52–584, Conn. Gen.Stat., provides that "[n]o action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct ... shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action

may be brought more than three years from the date of the act or omission complained of ...."

**8.** Section 52–577c, Conn. Gen.Stat., provides that "no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered."

year statute of limitations applicable to actions for personal injury or property damage caused by exposure to hazardous chemical substances.

86. CEPA does not provide a statute of limitations. *City of Bridgeport v. Santa Fuel, Inc.,* No. CV 980357102, 1999 WL 203794, at *3 n. 3 (Conn.Super.Ct. Apr.1, 1999). As this Court noted in *Calabrese,* 170 F.Supp.2d at 268, there has been considerable disagreement among the Connecticut courts as to which statute of limitations to apply to state environmental actions. *See, e.g., Doty v. Mucci,* 238 Conn. 800, 805 n. 6, 679 A.2d 945 (1996) (refusing to reach the issue of the applicable statute of limitations for § 22a–452 claims); *Electroformers, Inc. v. Emhart Corp.,* No. 29 78 91, 1993 WL 28904, at *4–6 (Conn.Super.Ct. Jan.29, 1993) (holding that plaintiff's claims under § 22a–452 were barred by the statute of limitations regardless of whether § 52–577c, § 52–582, or § 52–577 was applied); *Nielsen v. Sioux Tools, Inc.,* 870 F.Supp. 435, 441 (D.Conn.1994) (holding that the plaintiff's claims under § 22a–452 were barred by the statute of limitations but declining to decide which statute to apply).

87. This Court has previously rejected the argument that a claim under Conn. Gen.Stat. § 22a–452 constitutes a suit for quasi-contractual restitution subject to the six-year statute of limitations governing causes of action in contract. *Nielsen,* 870 F.Supp. at 441.

88. Section 309 of CERCLA, 42 U.S.C. § 9658, provides a uniform standard for determining the accrual date for claims of property damage caused to by exposure to hazardous substances that have been released into the environment from a facility. *Actions under State law for damages from exposure to hazardous substances (a) State statutes of limitations for hazardous substance cases*

*(1) Exception to State statutes*

In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally-required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). The term "federally required commencement date" ("FRCD") is then defined as the "date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (1)(a) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). The Second Circuit has held that it is "indisputably clear that Congress intended, in the cases to which § 9658 applies, that the FRCD preempt state law accrual rules if, under those rules, accrual would occur earlier than the date on which the cause of the [property damage] was, or reasonably should have been, known to be the hazardous substance." *Freier v. Westinghouse Elec. Corp.,* 303 F.3d 176, 196–97 (2d Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1899, 155 L.Ed.2d 824 (2003). However, the FRCD "preempts a more restrictive state law only with respect to the date on which a claim accrues, not with respect to the length of the limitations period." *Id.* at 210. Thus, Connecticut law would still control with respect to the length of the limitations period. *Id.; see also ABB In-*

*dus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir.1997).

89. The FRCD of CERCLA would clearly preempt the accrual date of Conn. Gen.Stat. § 52–577, which is an occurrence statute where the limitations period begins to run at the moment the act or omission complained of occurs. *See Gibbons v. NER Holdings, Inc.*, 983 F.Supp. 310, 314 (D.Conn.1997). The start of the running of the limitations period is not delayed until the injury has occurred or the cause of the injury has been discovered. *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212, 541 A.2d 472 (1988); *see Visconti v. Pepper Partners Ltd. P'ship*, 77 Conn.App. 675, 688, 825 A.2d 210 (2003) (holding that the plaintiff's claims under Conn. Gen.Stat. § 22a–16 were barred by the three-year statute of limitations in Conn. Gen.Stat. § 52–577, which began to run when the vendor caused the contamination of the property even though this was prior to the plaintiff's ownership of the contaminated property).

90. Similarly, the FRCD would preempt the three-year limitations period of Conn. Gen.Stat. § 52–584, which also runs from the date of the act or omission.

91. Section 52–577c(b), Conn. Gen.Stat., contains an accrual date based upon the plaintiff's discovery of the injury or damage—*i.e.*, "the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered." CERCLA, however, applies a discovery-of-causation accrual date—*i.e.*, the date when the plaintiff knew or reasonably should have known that the damages "were caused or contributed to by the hazardous substance." 42 U.S.C. § 9658(b)(4)(A). In many instances, the date that the causation was discovered would be later than the date the injury was discovered. We hold that the accrual date of Conn. Gen.Stat. § 52–577c(b) is also preempted.

92. Thus, we apply the accrual date embodied in § 309 of CERCLA to any of the three statutes of limitations.

93. However, we need not decide which state limitations period to apply to Durham's claims under Conn. Gen.Stat. § 22a–16 and § 22a–452 since the longest limitations period under any of the three statutes cited above is three years. The complaint was filed on December 30, 1999. It is undisputed that Durham knew that Merriam had disposed of hazardous substances on the Durham Meadows Superfund Site at least by 1993, when both Merriam and Durham were notified of their potential joint and several liability for the Site's contamination. Therefore, regardless of which limitations period applies, Durham's state-law claims were time-barred by 1996 at the latest.

94. Therefore, we find that Durham's state-law claims under Conn. Gen.Stat. § 22a–16 and § 22a–452 are barred by the State statute of limitations.

## VI. Attorneys' Fees

95. Under CERCLA, attorneys' fees incurred in prosecuting a cost recovery action are not recoverable. *Key Tronic Corp. v. United States*, 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994); *Bedford Affiliates*, 156 F.3d at 430; *Goodrich Corp.*, 311 F.3d at 174. Likewise, under CERCLA, "expenses incurred solely in preparation for litigation cannot be recovered as response costs unless they significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." *Gussack Realty Co.*, 224 F.3d at 91–92.

96. Although attorneys' fees are recoverable under state law, Conn. Gen.Stat. § 22a–18, *see Control Data Corp.*, 53 F.3d at 939 (awarding attorneys' fees under state law to the prevailing party, even though it did not recover any additional

damages under state law that were not recoverable under CERCLA), because we have found that Durham's state-law claims are barred by the statute of limitations, Durham may not recover attorneys' fees under state law.

97. Accordingly, Durham's request for attorneys' fees is denied.

### VII. Conclusion

98. On Plaintiff's claims under § 113(f)(1) of CERCLA, the Court awards Plaintiff, The Durham Manufacturing Company, $116,075.65 against Defendant Merriam Manufacturing Company, and $19,345.94 against Defendant Allan E. Adams, plus post-judgment interest.

99. The Court further awards Plaintiff pre-judgment interest, accruing from the latter of the date on which Plaintiff made demand for payment on the Defendants or the date of the expenditure. *See Goodrich Corp.*, 311 F.3d at 177 (holding that an award of pre-judgment interest under § 113(f) of CERCLA is mandatory). The Plaintiff is directed to submit a proposed prejudgment interest calculation to the Court within 14 days of the date of this Order to which Defendants will have 10 days to object.

100. Additionally, under CERCLA, Plaintiff is granted the following declaratory relief against Defendants Merriam and Adams: Defendant Merriam shall be liable for 30% of any future monitoring costs, EPA oversight costs, and necessary response costs incurred by Durham that relate to the Durham Meadows Superfund Site. Merriam is not responsible for those costs incurred by Durham that are attributable solely to the release of hazardous substances by Durham or that are attributable solely to cleanup of the soil, ground water, and/or surface water located at, on, or under the Durham Premises, or that are attributable to well-monitoring and/or filters for the residential wells for which

Durham is responsible under the Orders of the CTDEP. Likewise, Adams, as the owner of the Merriam Premises, shall be personally liable for 5% of such costs. *See Gussack Realty Co.*, 224 F.3d at 92; *Bedford Affiliates*, 156 F.3d at 432.

101. Plaintiff's claims under § 107(a) of CERCLA (Count I) are dismissed as to all Defendants.

102. Plaintiff's claims under Conn. Gen. Stat. § 22a–16 (Count III) are dismissed on statute of limitations grounds.

103. Plaintiff's claims under Conn. Gen. Stat. § 22a–452 (Count IV) are likewise dismissed on statute of limitations grounds.

104. All claims against Defendant Aztec Industries, L.L.C., d/b/a American Metal Crafters, are dismissed.

105. Plaintiff's request for an award of attorneys' fees is denied.

**SO ORDERED.**