******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COMMISSIONER OF ENVIRONMENTAL
PROTECTION *v.* UNDERPASS AUTO
PARTS COMPANY ET AL.
(SC 19329)

Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued May 20—officially released October 13, 2015*

*Kimberly P. Massicotte*, associate attorney general, with whom were *Sharon M. Seligman*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *David H. Wrinn*, assistant attorney general, for the appellant (plaintiff).

*John R. Bashaw*, with whom were *Desmond M. Ryan* and *Mary Mintel Miller*, for the appellees (named defendant et al.).

*Opinion*

PALMER, J. The primary issue that we must address in this appeal is whether, in an action brought by the Commissioner of Environmental Protection (commissioner)[1] pursuant to General Statutes § 22a-430 (d),[2] the trial court, upon finding that any person had caused pollution of the waters of the state, is required to order that person to remediate the effects of the pollution pursuant to applicable standards promulgated by the commissioner and, if so, the extent to which the court may exercise its equitable powers to craft an appropriate remedy. The commissioner brought this action against the defendants, Underpass Auto Parts Company (Underpass Auto), Wallingford Used Parts & Recycling, Inc. (Wallingford Used Parts), Dwain P. Thibodeau, Sr., and Thibodeau doing business as Underpass Used Auto Parts, Inc.,[3] alleging, among other things, that the defendants had violated General Statutes §§ 22a-430 (a),[4] 22a-430b[5] and 22a-427,[6] which are part of the Water Pollution Control Act, General Statutes § 22a-416 et seq. In addition, the commissioner brought a claim against the defendants pursuant to General Statutes § 22a-354s (b),[7] alleging that the defendants had violated the regulations of the Aquifer Protection Act, General Statutes § 22a-354g et seq. The trial court found that the defendants had violated these statutes and rendered judgment against them. The court also concluded that Thibodeau was personally liable for the corporate defendants' violations of the Water Pollution Control Act under the responsible corporate officer doctrine, but that he could not be held personally liable under that doctrine for the corporate defendants' civil violations of the Aquifer Protection Act. As the remedy, the trial court ordered the defendants to pay certain fines and to retain a licensed environmental professional to assist the defendants in complying with the statute, to conduct testing on the site where the discharges occurred to determine if "a significant environmental hazard" exists and, if so, to abate the condition. The commissioner then filed this appeal[8] claiming that: (1) having found that the defendants had violated these environmental statutes, the trial court was required by law to order the defendants to remediate the pollution in accordance with remediation standards promulgated by the commissioner, and that the court did not have discretion to fashion a remedy that did not purport to do so; and (2) the trial court incorrectly determined that the responsible corporate officer doctrine did not apply to civil violations of the Aquifer Protection Act. We agree with the commissioner's first claim, and we further conclude that the trial court's order also constituted an abuse of discretion because it was effectively unenforceable. Accordingly, the commissioner is entitled to a new trial. We reject, however, the commissioner's second claim.

The trial court found the following facts that the

parties do not dispute. The defendants operate a junkyard and motor vehicle recycling facility located at 1125 South Broad Street in Wallingford (site) and they have done so since at least 2003. Thibodeau is an officer of both Underpass Auto and Wallingford Used Parts. The site, which is not paved, covers approximately three acres. The site is located approximately 1500 feet from two public water supply wells and is within a designated aquifer protection area as defined by General Statutes § 22a-354h (10).[9]

On October 16, 2003, Thibodeau submitted to the Department of Energy and Environmental Protection (department)[10] a registration for coverage under the department's general permit for the discharge of storm water from industrial activity at the site pursuant to § 22a-430b. Thereafter, the department issued a certificate of registration to Underpass Used Auto Parts, Inc. In 2009, Thibodeau applied for a renewal of the certificate of registration, which was also granted.[11] Between 2003 and 2013, employees of the department inspected the site on numerous occasions and observed oil staining dirt on the site. As the result of these inspections, the commissioner issued notices of violation to the defendants in 2005 and 2007.

The commissioner brought this action against the defendants in 2009. The operative complaint alleges that the defendants had: (1) failed to register under the general permit for discharge of storm water as required by § 22a-430b (a) for the period between March 19 and October 16, 2003; (2) failed to comply with the general permit in violation of § 22a-430b (a); (3) discharged substances into the waters of the state without a permit in violation of § 22a-430 (a); and (4) polluted the waters of the state in violation of § 22a-427. All of these claims were brought pursuant to the Water Pollution Control Act. The complaint further alleged that the corporate defendants had failed to comply with aquifer protection regulations in violation of § 22a-354s (b), under the Aquifer Protection Act. Finally, the complaint alleged that Thibodeau was personally liable for the violations of the Water Pollution Control Act both as a participant in the conduct and under the responsible corporate officer doctrine, and he was personally liable for the violations of the Aquifer Protection Act under the responsible corporate officer doctrine.

After a trial to the court, the trial court found the facts previously set forth in this opinion and concluded that "[p]ollution of the surface and groundwater [was] likely given the levels of contaminants in the soil."[12] It further concluded that "based on this evidence as well as the broad definitions of the [applicable] statutory terms . . . that there has been pollution of, and a discharge of substances or materials into, waters of the state from the site since 2003. The commissioner has not specifically issued a permit for these discharges.

Further, there was a failure to take all reasonable steps to minimize or prevent a discharge having a reasonable likelihood of adversely affecting the environment. Thus, violations of . . . §§ 22a-427, 22a-430 (a), and the regulations promulgated under . . . § 22a-430b have occurred." (Footnote omitted.) Accordingly, the court expressly concluded that the defendants had violated these statutory and regulatory provisions. In addition, the court concluded that the commissioner had established "past violation by [these] defendants of the aquifer regulations and future dangers to the aquifers located nearby" in violation of the Aquifer Protection Act. Finally, the court determined that Thibodeau was personally liable for the violations of the Water Pollution Control Act under the responsible corporate officer doctrine, but that that doctrine did not apply to civil violations of the Aquifer Protection Act because § 22a-354s (c)[13] limits the application of the doctrine to criminal violations of the Aquifer Protection Act.

The trial court then turned to the question of the proper remedy. The court concluded that, in fashioning a remedy, it should be guided by General Statutes § 22a-438 (a).[14] The court also concluded that it should consider: "(1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of the violation; (4) the good faith efforts made by the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of future violations; and (7) the fair and equitable treatment of the regulated community."[15] (Internal quotation marks omitted.) *Keeney* v. *L & S Construction*, 226 Conn. 205, 214, 626 A.2d 1299 (1993).

The court found that the defendants had not acted wilfully, but negligently, and that they had cooperated with the commissioner in an attempt to clean up the site, "albeit at a somewhat sluggish pace . . . ." The court then reiterated that, despite these efforts, the defendants had allowed "continuous contamination of the soil at the site and, in all probability, pollution of surface and groundwater near the site." The court also found, however, that "the commissioner has not proven tangible harm to the waters of the state." The court further observed that, "[t]his case is not one in which the . . . defendants have significantly polluted our streams, rivers, ponds, lakes, oceans, or public water supplies. There is certainly a valid concern for the purity of the public well water at most 1500 feet away. But, at this point, largely because of the commissioner's intervention and the [defendants'] ultimate cooperation, that potential has fortunately not become realized." In addition, the court found that Thibodeau and his wife had earned only "modest salaries" from operating the site.

On the basis of these findings, the trial court con-

cluded that the costs of a "three phase program of investigation and remediation" of the pollution at the site, which the commissioner had requested, would "approach being prohibitive."[16] The court also accepted the opinion of the defendants' expert witness that "it is not necessary to conduct a full investigation and remediation of the site, given that contamination levels were below that posing a significant environmental hazard, at least until there is a transfer or redevelopment of the property." The court then ordered the defendants to "retain an environmental consultant, approved by the commissioner, for three subsequent years to assist these defendants with compliance with storm water and aquifer protection statutes and regulations." In addition, the court ordered the defendants to "retain a licensed environmental professional, approved by the commissioner, to plan for and conduct groundwater sampling on the site to determine if a significant environmental hazard . . . exists. If it exists, the defendants shall have the obligation to abate the condition. The defendants must complete the planning, sampling, and abatement within two years." Finally, the court ordered the defendants to pay a fine of $8000 pursuant to § 22a-438 (a) of the Water Pollution Control Act. With respect to the violations of the Aquifer Protection Act, the trial court ordered the corporate defendants to pay a fine of $2000 pursuant to § 22a-354s (b).[17]

The commissioner claims on appeal that, having found that the defendants had polluted the waters of the state in violation of the Water Pollution Control Act and the Aquifer Protection Act, the trial court was required by law to order the defendants to remediate the pollution pursuant to the remediation standard regulations promulgated by the commissioner; Regs., Conn. State Agencies § 22a-133k-1 et seq.; and did not have authority to order a different form of injunctive relief. The commissioner further claims that the trial court incorrectly determined that the responsible corporate officer doctrine did not apply to civil violations of the Aquifer Protection Act.

I

We first address the commissioner's claim that the order issued by the trial court was unlawful because it does not require the defendants to remediate the site in accordance with the standard remediation regulations. Inherent in the commissioner's claim is the contention that the court abused its discretion in purporting to apply traditional equitable principles in determining whether and to what extent the defendants would be required to remediate the pollution. For the reasons set forth hereinafter, we agree with the commissioner that the remedy ordered by the trial court was improper. We further conclude that, when the trial court has found in an action brought under § 22a-430 (d) that the defendant has caused pollution of the waters of the state, the

court is required to order remediation of the pollution pursuant to the remediation standard regulations, but that the court has the discretion, derived from its equitable powers and consistent with the statutory scheme, to fashion a remedy that takes into account the various relevant considerations.

As we have indicated, although the trial court concluded that the defendants were not required to conduct a full investigation and remediation of the site because the "contamination levels were below that posing a significant environmental hazard," the court ordered the defendants to hire an environmental consultant to "assist [them] with compliance" with the governing statutes and regulations. As we explain more fully herein, however, *full* compliance with the governing statutes and regulations would require a full investigation and remediation of the site pursuant to the remediation standard regulations promulgated by the commissioner. Although it appears that the court intended that something less than full compliance would be adequate, it provided no guidance as to what that level of compliance should be. In the absence of such guidance, it will be impossible to ascertain the adequacy of any remediation efforts that the defendants ultimately might undertake. In such circumstances, when the court's order is so vague that the parties cannot determine what conduct is required to comply with it, the order is effectively unenforceable. See, e.g., *Adams* v. *Vaill*, 158 Conn. 478, 485–86, 262 A.2d 169 (1969) ("the [injunctive] decree should be sufficiently clear and definite in its terms for the defendant to be able to determine with reasonable certainty what conduct on his part is required or prohibited"); see also *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 242 n.11, 796 A.2d 1164 (2002) (enforceability of injunctive order depends on whether order identifies required or prohibited conduct with reasonable clarity).

Moreover, the trial court's order that the defendants conduct groundwater sampling to determine if a significant environmental hazard exists and, if so, to abate the condition, appears to derive from General Statutes § 22a-6u, which sets forth notification and reporting requirements when contaminated soil or water is discovered. The commissioner made no claim under that statutory provision, however, which sets forth certain requirements for *reporting* pollution, not *remediation* requirements.[18] Furthermore, the term "significant environmental hazard" is not statutorily defined. Assuming that the trial court intended the term to refer to the level of pollution that would trigger the reporting requirements in § 22a-6u, those levels are in some cases many times the levels requiring remediation pursuant to the commissioner's remediation standard regulations.[19] See, e.g., General Statutes § 22a-6u (d) (1) (reporting requirement is triggered when pollution is "at a concentration at or above thirty times" criteria set forth in

regulations). Whatever the parameters of the trial court's discretion to fashion an appropriate remedy, it is not within the court's discretion to ignore the claims that the commissioner actually raised or to invent a remediation standard that may permit significantly greater pollution than is permitted by the governing statutes and regulations. Consequently, this component of the trial court's order in the present case cannot stand.[20] Because this aspect of the court's order may well have influenced the other relief that the trial court ordered, we cannot simply vacate this portion of the order and leave the rest of it in place, especially when another critical aspect of that order was so vague as to be unenforceable. Cf. *Waterbury* v. *Washington*, 260 Conn. 506, 597–98, 800 A.2d 1102 (2002) ("When the trial court fashioned its uniform remedial order, it did so on the premise that [the city's] conduct violated both [the Connecticut Environmental Protection Act, General Statutes § 22a-14 et seq. (CEPA)] and its contract with [the town]. It is apparent to us . . . that the entire order . . . constituted a remedial mosaic. On this record, therefore, we cannot be confident that, had the CEPA claim been determined pursuant to the [applicable substantive] statute—as it must, at least initially, on the remand—the trial court would nonetheless have issued the same remedial order on the contract claim. We therefore leave to the proceedings on the remand the question of the scope of the remedy for [the city's] violation of the contract."). We therefore conclude that the judgment of the trial court must be reversed.

Although this conclusion is dispositive, we address the commissioner's contention that the trial court was required by law to order the defendants to remediate the pollution in accordance with the remediation standard regulations because it is an issue that is likely to arise on remand. This issue involves the proper interpretation of the governing statutes and regulations and therefore presents a question of law. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 231, 915 A.2d 290 (2007) (when plaintiffs claimed that trial court misinterpreted statute in denying requested injunctive relief, "our inquiry focuses on whether the trial court's decision was based on an erroneous statement of the law"); see also *Hudson Valley Bank* v. *Kissel*, 303 Conn. 614, 625 n.9, 35 A.3d 260 (2012) ("when a court sits in equity . . . its resolution of a question of law, such as the determination of the applicable legal principle, is subject to de novo review"). "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek

to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Rainforest Cafe, Inc.* v. *Dept. of Revenue Services*, 293 Conn. 363, 371–72, 977 A.2d 650 (2009).

We begin our analysis with the language of the governing statutory provision. Section 22a-430 (d) provides in relevant part: "If the commissioner finds that any person or municipality has initiated, created or originated or is maintaining any discharge[21] into the waters of the state without a permit as required in subsection (a) of this section, or in violation of such a permit . . . the commissioner may request the Attorney General to bring an action in the superior court for the judicial district of Hartford (1) to enjoin such discharge by such person or municipality until the person or municipality has received a permit from the commissioner or has complied with a permit which the commissioner has issued pursuant to this section, or (2) for injunctive relief to remediate the effects of such discharge. . . ." (Footnote added.) The commissioner contends that, pursuant to this statute, she "is entitled to injunctive relief to 'remediate the effects of the [unlawful] discharge,' " and that remediation pursuant to the remediation standard regulations promulgated by the commissioner is required as a matter of law because those regulations provide the only standard by which remediation can be measured. The defendants maintain that the language of § 22a-430 (d) does not *entitle* the commissioner to such relief, but merely authorizes her to *request* it, and the trial court has broad discretion to craft the proper remedy. Neither one of these interpretations of the specific statutory language at issue is implausible, but neither one is substantially more persuasive than the other.

We turn next to other related statutes. General Statutes § 22a-422, which sets forth the policy underlying the Water Pollution Control Act, provides: "It is found and declared that the pollution[22] of the waters of the state is inimical to the public health, safety and welfare

of the inhabitants of the state, is a public nuisance and is harmful to wildlife, fish and aquatic life and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water, and that the use of public funds and the granting of tax exemptions for the purpose of controlling and eliminating such pollution is a public use and purpose for which public moneys may be expended and tax exemptions granted, and *the necessity and public interest for the enactment of this chapter and the elimination of pollution is hereby declared as a matter of legislative determination.*" (Emphasis added; footnote added.) Thus, the primary purpose of the Water Pollution Control Act is the elimination of pollution. To further this statutory goal, General Statutes § 22a-133k (a) requires the commissioner to "adopt regulations . . . setting forth standards for the remediation of environmental pollution at . . . properties which have been subject to a spill, as defined in section 22a-452c[23] . . . ." (Footnote added.) In accordance with this provision, the commissioner has adopted the remediation standard regulations; see Regs., Conn. State Agencies § 22a-133k-1 et seq; which "apply to any action taken to remediate polluted soil, surface water or a ground-water plume at or emanating from a release area which action is . . . required pursuant to Chapter . . . 446k[24] of the General Statutes . . . ." (Footnote added.) Id., § 22a-133k-1 (b) (1).

In the present case, the trial court expressly found that, as the result of the defendants' operations at the site, "there has been *pollution* of, and a discharge of substances or materials into, waters of the state from the site since 2003." (Emphasis added.) If the defendants are not required to remediate the effects of their discharges into the waters of the state as required by the applicable remediation standard regulations, the discharges will continue to *pollute* the waters of the state, thereby undermining not just the technical formalities of the statutory permitting scheme, but also the fundamental and overriding purpose of the Water Pollution Control Act—to eliminate water pollution. In light of the clear legislative purpose of that act as expressed in § 22a-422, the requirement of § 22a-133k that the commissioner adopt remediation standards to implement that legislative intent, and the inability of the defendants to identify any other applicable standards or guidelines,[25] we agree with the commissioner that, on remand, the trial court will be required to order the remediation of the pollution pursuant to the remediation standard regulations.[26] See *Conservation Commission* v. *Price*, 193 Conn. 414, 430, 479 A.2d 187 (1984) ("[i]t is the court's duty to carry out the intention of the legislature as expressed in the statute it has enacted and to make the remedy it has provided an effective and efficient means of dealing with violations of the act and regulations properly promulgated under its

authority"); see also *Tennessee Valley Authority* v. *Hill*, 437 U.S. 153, 194, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) ("[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought"); *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 382, 627 A.2d 1296 (1993) ("[e]nvironmental statutes, considered remedial in nature, are to be construed liberally to reach the desired result"); *United States* v. *Stevens*, 103 Conn. 7, 19, 130 A. 249 (1925) ("[t]he finding of the fact of violation [of the National Prohibition Act] was for [the trial court] to make; having found it, the issuance of the order of abatement must follow as of course by the terms of the [a]ct").

In support of their contrary claim, the defendants rely on a number of cases holding that a court has discretion to depart from an applicable statutory scheme and to apply traditional equitable principles in crafting injunctive relief. As the commissioner maintains, however, those cases are distinguishable. In *Weinberger* v. *Romero-Barcelo*, 456 U.S. 305, 306–307, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982), the plaintiffs, the governor of Puerto Rico and certain residents of the island, brought an action pursuant to the federal Water Pollution Control Act to enjoin the United States Navy (Navy) from discharging ordnance into the coastal waters during weapons training. The United States District Court for the District of Puerto Rico found that the Navy had violated the federal statute by discharging ordnance into the waters without first obtaining a permit from the federal Environmental Protection Agency; id., 308; but refused to enjoin the Navy from continuing its operations until it obtained a permit because the ordnance was not causing an "appreciable harm to the environment." (Internal quotation marks omitted.) Id., 309–10. On appeal, the Court of Appeals for the First Circuit concluded that, "[w]hether or not the Navy's activities in fact harm the coastal waters, it has an absolute statutory obligation to stop any discharges or pollutants until the permit procedure has been followed and the Administrator of the Environmental Protection Agency, upon review of the evidence, has granted a permit." (Internal quotation marks omitted.) Id., 311. On further appeal, the United States Supreme Court held that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." Id., 313. The court further concluded that an injunction was "not the only means of ensuring compliance" with the federal statute, the purpose of which was to preserve the "integrity of the [n]ation's waters . . . not the permit process . . . ." Id., 314. Because the Navy's discharge of ordnance had not polluted the waters, the

District Court's order had "neither ignored the statutory violation nor undercut the purpose and function of the permit system." Id., 315; see also id., 320 (statute "permits the [D]istrict [C]ourt to order that relief it considers necessary to secure prompt compliance with [that] [a]ct"). The court concluded that, because Congress had "not foreclosed the exercise of equitable discretion, the proper standard for appellate review is whether the District Court abused its discretion in denying an immediate cessation order while the Navy applied for a permit." Id. Accordingly, the court reversed the judgment of the Court of Appeals and remanded the case so that that court could apply the proper standard of review. Id. *Weinberger* is readily distinguishable from the present case because the District Court's order allowing the Navy to continue its operations did not allow pollution to continue in violation of the fundamental purpose of the federal Water Pollution Control Act.

The defendants also rely on *Hecht Co.* v. *Bowles*, 321 U.S. 321, 64 S. Ct. 587, 88 L. Ed. 754 (1944). In that case, the administrator of the federal Office of Price Administration brought an action against a retail store alleging that it had violated the federal Emergency Price Control Act of 1942. Id., 321–22. The United States District Court for the District of Columbia found that the retail store had violated the provisions of that act, but also found that it had immediately corrected the violations and taken steps to prevent future violations. Id., 325–26. Accordingly, that court declined to enjoin the retail store from engaging in future violations but the Court of Appeals for the District of Columbia reversed that judgment. Id., 326. On appeal, the United States Supreme Court held that, because the statute authorized the District Court to issue "a permanent or temporary injunction, restraining order, *or other order*"; (emphasis added; internal quotation marks omitted) id., 328; and because the legislative history indicated that Congress had intended to authorize the courts "to issue whatever order to enforce compliance is proper in the circumstances of each particular case"; (internal quotation marks omitted) id., 329; the District Court had discretion to exercise traditional equitable principles in crafting a remedy. Id., 329–30. The court further held that that discretion "must be exercised in light of the large objectives of the [applicable statutes]." Id., 331. Thus, *Hecht Co.* is distinguishable from the present case both because the District Court's refusal to order an injunction did not allow the retail store to continue to violate the Emergency Price Control Act of 1942 and because the statutory scheme expressly contemplated that courts would have broad discretion to tailor the form of relief to the specific facts of each case.

It bears noting that our conclusion that the trial court in the present case will be required to order remediation of the pollution pursuant to the applicable remediation standard regulations does not necessarily mean that

the trial court is required to order strict compliance with the Water Pollution Control Act and its implementing regulations in all cases, no matter what the nature of the alleged violation. See *Conservation Commission* v. *Price*, supra, 193 Conn. 430 ("[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a [trial judge] . . . is not mechanically obligated to grant an injunction for every violation of law" [internal quotation marks omitted]). For example, if the commissioner brought an action under § 22a-430 (d) and proved that the defendant had discharged substances into the waters of the state without a permit in violation of the Water Pollution Control Act, but failed to prove that the waters have been polluted, it is possible that, as in *Weinberger*, upon balancing the equities, a court could determine that the defendant should be allowed to continue making the discharges during the permit application process because discontinuing operations would be extremely costly, the issuance of a permit was likely and allowing the discharges would not undermine the fundamental purpose of the Water Pollution Control Act.

We also conclude that, upon finding that a defendant has polluted the waters of the state, the trial court, as a practical matter, necessarily has discretion under § 22a-430 (d) to direct the precise contours and timing of the remediation process. After all, the primary remedy contemplated by the legislature under that provision is "injunctive relief," which, by its very nature, invokes the equitable authority of the court. Indeed, the commissioner conceded as much in oral argument before this court.[27] By way of example, in a proper case, the court reasonably could elect to set an annual cap on the remediation costs that the defendant will be required to pay. It would not further the purposes of the Water Pollution Control Act to order a remedy that is so draconian and costly that it would prevent a defendant from contributing to the cost of remediation over the long term by immediately bankrupting it. When considering the cost of remediation in crafting a remedy, however, the trial court's primary goal should be to maximize the prevention and elimination of pollution, not to minimize the economic impact on the defendant.[28] See *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 380 (legislative history of Water Pollution Control Act shows that purpose of proposed legislation was to allow Water Resources Commission, now incorporated into department, to "operate more vigorously in issuing orders of abatement and ultimately seeking injunctions to abate water pollution, regardless of concerns of economic feasibility"); id., 381 (legislature intended that, "[r]egardless of the cost of the pollution abatement measures issued by the commission, the measures were to be enforced if in fact the technology existed to enforce them").

Finally, we turn to the question of the relief that we should order. The commissioner requests that we vacate the trial court's orders and remand the case to that court so that it may apply the proper standard in crafting a new remedy. Because the remedy is intertwined with the scope and nature of the pollution at the site, however, and in light of our conclusion that the trial court retains discretion to control the manner of the required remediation, including the timing and, potentially, the cost of compliance, we believe that a new trial is required so that the parties may present evidence on those issues.[29] Accordingly, we conclude that the case must be remanded to the trial court for a new trial.

## II

The commissioner also claims that the trial court improperly determined that Thibodeau could not be held personally liable under the responsible corporate officer doctrine for the corporate defendants' civil violations of the Aquifer Protection Act. Specifically, the trial court concluded that, "in light of the specific reference to the [responsible corporate officer] doctrine in [§ 22a-354s (c), governing criminal violations of the Aquifer Protection Act],[30] and its absence in the civil . . . statutes . . . the responsible corporate officer doctrine does not apply to the civil aquifer statutes alleged here." (Footnote added.) Because this issue is also likely to arise on remand, we address it. We conclude that the trial court properly determined that Thibodeau may not be held personally liable for the corporate defendants' civil violations of the Aquifer Protection Act under the responsible corporate officer doctrine.

Whether the responsible corporate officer doctrine may be applied to violations of the Aquifer Protection Act is a question of law subject to plenary review. *Celentano* v. *Rocque*, 282 Conn. 645, 663, 923 A.2d 709 (2007). We begin our analysis with a review of the responsible corporate officer doctrine. Under that doctrine, a corporate officer may be held personally liable for a corporation's violation of a statute involving "a strict liability public welfare [offense]"; id., 668; when "(1) the officer is in a position of responsibility that allows that officer to influence corporate policies and activities; (2) there is a nexus between the officer's actions or inactions in that position and the violation of [the statute] such that the corporate officer influenced the corporate actions that constituted the violation; and (3) the corporate officer's actions or inactions resulted in the violation." (Internal quotation marks omitted.) Id., 663–64. "Public welfare statutes share three common elements. First, they protect the public health, safety or welfare. . . . Second, they protect the public from harms from which the public cannot protect themselves. . . . Third, public welfare statutes have either a reduced mens rea

requirement or require none at all." (Citations omitted.) Id., 666–67.

This court previously has recognized that "[t]he responsible corporate officer doctrine is a common-law theory of liability." Id., 665. Accordingly, we ordinarily "do not need to determine whether the legislature explicitly has adopted the responsible corporate doctrine in [the statute under review], but rather whether [the statute] is the type of statute to which the doctrine generally may apply." Id. On the basis of these principles, we previously have held that the doctrine applies to violations of the Water Pollution Control Act; *BEC Corp.* v. *Dept. of Environmental Protection*, 256 Conn. 602, 618, 775 A.2d 928 (2001); and to violations of General Statutes § 22a-402, governing the inspection and repair of dams. *Celentano* v. *Rocque*, supra, 282 Conn. 668.

In the present case, the commissioner points out that "[t]he responsible corporate officer doctrine is a common-law theory of liability." Id., 665. She contends that, because the Aquifer Protection Act is a strict liability public welfare provision—which the defendants do not dispute—it "is the type of statute to which the [responsible corporate officer] doctrine generally may apply." Id. Accordingly, she asserts, the trial court incorrectly concluded that Thibodeau could not be held personally liable under the doctrine because the reference to responsible corporate officers in § 22a-354s (c) implies that the legislature intended to limit the application of the doctrine to that subsection.

We are not persuaded by the commissioner's argument. Although the responsible corporate officer doctrine is a common-law theory of liability, the doctrine generally is applied to statutory violations, and we have repeatedly recognized that its application must be consistent with the intent of legislature. See id., 666 (definition of "person" in General Statutes [Rev. to 2007] § 22a-2 [c] [now § 22a-2 (b)] "evidences the legislature's intent to cast a wide net"); *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 616 (question of whether responsible corporate officer doctrine applies "rests upon an interpretation of [General Statutes §§] 22a-432 and . . . 22a-423"). In the present case, the legislature has evinced an intent that, for purposes of the Aquifer Protection Act, the responsible corporate officer doctrine applies *only* to criminal violations under § 22a-354s (c). See footnote 30 of this opinion. If the legislature had intended for the doctrine to apply to fines for civil violations imposed pursuant to § 22a-354s (b), it clearly knew how to say so. See *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 717, 674 A.2d 845 (1996) ("[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a differ-

ent intention existed" [internal quotation marks omitted]); see also *People* v. *Celotex Corp.*, 516 F. Supp. 716, 719 (C.D. Ill. 1981) (when one section of federal Clean Air Act expressly provided that responsible corporate officer would be liable for violation of that section, it was "clear that Congress did not intend that corporate officers be subject to suit" under separate section with no such language); *People* v. *Commonwealth Edison Co.*, 490 F. Supp. 1145, 1148 (N.D. Ill. 1980) (express provision in one section of federal Clean Air Act making corporate officers liable for violation "militates against bringing such individuals within the ambit of [another section] of [that] [a]ct in which such express inclusion is lacking").

In support of her claim to the contrary, the commissioner points out that a number of courts have rejected the claim that, when the legislature has expressly provided that a responsible corporate officer doctrine is liable only for a criminal violation of a public welfare statute, the courts are prohibited from applying the responsible corporate officer to civil violations. See, e.g., *Stillwater of Crown Point Homeowner's Assn., Inc.* v. *Stiglich*, 999 F. Supp. 2d 1111, 1133 (N.D. Ind. 2014) (responsible corporate officer doctrine extends to civil violations of federal Clean Water Act even though criminal provision of that act, unlike civil provision, expressly applies to responsible corporate officers); *Newburgh* v. *Sarna*, 690 F. Supp. 2d 136, 163 (S.D.N.Y. 2010) (declining to grant motion to dismiss in favor of individual defendant on ground that he could not be held personally liable for civil violations of federal Clean Water Act), aff'd in part and appeal dismissed in part, 406 Fed. Appx. 557 (2011).[31] Those cases, however, can be traced back to the decision of the United States Court of Appeals for the Sixth Circuit in *United States* v. *Hodges X-Ray, Inc.*, 759 F.2d 557 (6th Cir. 1985). See *Stillwater of Crown Point Homeowner's Assn., Inc.* v. *Stiglich*, supra, 1133, citing *United States* v. *Hodges X-Ray, Inc.*, supra, 560–61; *Newburgh* v. *Sarna*, supra, 160–61, citing *United States* v. *Hodges X-Ray, Inc.*, supra, 561. The individual defendant in *Hodges X-Ray, Inc.*, claimed that he could not be held personally liable for the corporate defendant's violations of the federal Radiation Control for Health and Safety Act of 1968 because he was not a " 'manufacturer' " as defined in that act. *United States* v. *Hodges X-Ray, Inc.*, supra, 560. He contended that, under the seminal cases of *United States* v. *Park*, 421 U.S. 658, 673–74, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975), and *United States* v. *Dotterweich*, 320 U.S. 277, 284, 64 S. Ct. 134, 88 L. Ed. 48 (1943), the responsible corporate officer doctrine applied only to criminal liability. *United States* v. *Hodges X-Ray, Inc.*, supra, 560–61; see also *United States* v. *Park*, supra, 660, 673–74 (corporate officer may be held personally liable for violating criminal provision of federal Food, Drug, and Cosmetic Act when

officer "had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and . . . he failed to do so"); *United States* v. *Dotterweich*, supra, 284 (corporate officer who aids and abets violation of criminal provision of federal Food, Drug, and Cosmetic Act can be held personally liable). The court in *Hodges X-Ray, Inc.*, concluded that "the rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved, which at most would result in a monetary penalty. The fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders *civil* liability appropriate as well." (Emphasis in original.) *United States* v. *Hodges X-Ray, Inc.*, supra, 561. The statutory schemes under review in *Hodges X-Ray, Inc.*, *Park* and *Dotterweich*, however, did not expressly provide that a corporate officer could be held liable for violations of the criminal provisions of the relevant statutes. Thus, there was no evidence in those cases that Congress had intended to *limit* the liability of corporate officers to such violations.[32] Because *Hodges X-Ray, Inc.*, *Park* and *Dotterweich* do not support the proposition that, when the legislature has expressly provided that an individual defendant may be held personally liable for the violation of a criminal provision of a public welfare statute as a responsible corporate officer, the individual may also be held liable for violations of civil provisions that do not contain such a provision, we find the United States District Court cases on which the commissioner relies to be unpersuasive.

The commissioner also points out that this court concluded in *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 618, that the responsible corporate officer doctrine applied to civil enforcement proceedings under the Water Pollution Control Act, despite the fact that only the criminal provisions of that act expressly provide that "person includes any responsible corporate officer or municipal official." General Statutes § 22a-438 (b) through (e). As the defendants point out, however, the specific statutes at issue in *BEC Corp.* were §§ 22a-432 and 22a-423. *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 616–17. The criminal liability provision of § 22a-438 (b) was not brought to the court's attention. Moreover, as we observed in *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 617, for purposes of the civil violations described in § 22a-432, a " 'person' " is defined to include "any officer . . . of any . . . corporation . . . ." General Statutes § 22a-423. Thus, the plain language of the applicable statutes strongly supported our conclusion that a corporate officer could be held liable

for a corporation's civil violation of § 22a-432, at least if the officer had "a responsible relationship to a violation of the act." *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 619. In contrast, for purposes of the Aquifer Protection Act, " 'person' " is defined as "any individual, firm, partnership, association, syndicate, company, trust, corporation, limited liability company, municipality, agency or political or administrative subdivision of the state, or other legal entity of any kind." General Statutes § 22a-2 (b). Although broad, this language does not so clearly include responsible corporate officers that it negates the inference that, by expressly including the responsible corporate officer language in § 22a-354s (c), the legislature intended to limit the applicability of the responsible corporate officer doctrine to that subsection.[33] Accordingly, we also are not persuaded by this claim.

The judgment is reversed and the case is remanded for a new trial in accordance with this opinion.

In this opinion the other justices concurred.

[1] In July, 2011, subsequent to the underlying events in the present case, the Commissioner of Environmental Protection became the Commissioner of Energy and Environmental Protection. See Public Acts 2011, No. 11-80, §§ 1, 55.

[2] General Statutes § 22a-430 (d) provides: "If the commissioner finds that any person or municipality has initiated, created or originated or is maintaining any discharge into the waters of the state without a permit as required in subsection (a) of this section, or in violation of such a permit, the commissioner may issue an order to abate pollution which shall include a time schedule for the accomplishment of the necessary steps leading to the abatement of such pollution, or notwithstanding any request for a hearing pursuant to section 22a-436 or the pendency of an appeal therefrom, the commissioner may request the Attorney General to bring an action in the superior court for the judicial district of Hartford (1) to enjoin such discharge by such person or municipality until the person or municipality has received a permit from the commissioner or has complied with a permit which the commissioner has issued pursuant to this section, or (2) for injunctive relief to remediate the effects of such discharge. Any such action brought by the Attorney General shall have precedence in the order of trial as provided in section 52-191."

[3] The operative complaint also named Matthew L. Imerson, as administrator of the estate of Emiel Immerson, the owner of the site, as a defendant. The trial court rendered judgment in favor of Matthew L. Imerson, in his administrative capacity, and that ruling is not at issue in this appeal.

We refer to Underpass Auto, Wallingford Used Parts and Thibodeau, collectively, as the defendants. References in this opinion to the corporate defendants are to Underpass Auto and Wallingford Used Parts.

[4] General Statutes § 22a-430 (a) provides in relevant part: "No person or municipality shall initiate, create, originate or maintain any discharge of water, substance or material into the waters of the state without a permit for such discharge issued by the commissioner. . . ."

[5] General Statutes § 22a-430b provides in relevant part: "(a) (1) The Commissioner of Energy and Environmental Protection may issue a general permit for a category or categories of discharges regulated pursuant to section 22a-430, except for a discharge covered by an individual permit. The general permit may regulate, within a geographical area: (A) A category of discharges which involve the same or substantially similar types of operations, involve the same type of wastes, require the same effluent limitations, operating conditions or standards, and require the same or similar monitoring and which in the opinion of the commissioner are more appropriately controlled under a general permit; (B) stormwater discharges; or (C) a category of discharges not requiring a permit under the federal Water Pollution Control Act. Any person or municipality conducting an activity covered by a general permit shall not be required to apply for or obtain an individual

permit pursuant to section 22a-430, except as provided in subsection (c) of this section. The general permit may require that any person or municipality initiating, creating, originating or maintaining any discharge into the waters of the state under the general permit shall register such discharge with the commissioner before the general permit becomes effective as to such discharge. Registration shall be on a form prescribed by the commissioner. . . .”

We note that although § 22a-430b has been amended several times since the time of the alleged statutory violations in the present case; see, e.g., Public Acts 2012, No. 12-172, § 1; the changes are not relevant to this appeal. For convenience, we refer to the current revision of the statute.

[6] General Statutes § 22a-427 provides: “No person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provision of this chapter.”

[7] General Statutes § 22a-354s (b) provides: “Any person who commits, takes part in, or assists in any violation of any provision of sections 22a-354o to 22a-354t, inclusive, or section 14 of public act 89-305 or any ordinance or regulation promulgated by municipalities pursuant to the grant of authority herein contained, shall be assessed a civil penalty of not more than one thousand dollars for each offense. Each violation of said sections shall be a separate and distinct offense, and, in the case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense. The Superior Court, in an action brought by the commissioner, municipality, district or any person shall have jurisdiction to restrain a continuing violation of said sections, to issue orders directing that the violation be corrected or removed, and to assess civil penalties pursuant to this section. All costs, fees and expenses in connection with such action shall be assessed as damages against the violator together with reasonable attorney's fees which may be allowed, all of which shall be awarded to the municipality, district or person bringing such action.”

[8] The commissioner appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[9] General Statutes § 22a-354h provides in relevant part: “(10) ‘Aquifer protection area’ means any area consisting of well fields, areas of contribution and recharge areas, identified on maps approved by the Commissioner of Energy and Environmental Protection pursuant to sections 22a-354b to 22a-354d, inclusive, within which land uses or activities shall be required to comply with regulations adopted pursuant to section 22a-354o by the municipality where the aquifer protection area is located . . . .”

[10] Effective July 1, 2011, the legislature established the department as the successor agency to the Department of Environmental Protection. See Public Acts 2011, No. 11-80, § 1.

[11] Although the trial court did not make specific findings regarding the issuance of these permits, these facts are not disputed.

[12] In addition to the foregoing facts, the trial court also found that, in April, 2013, approximately four months before trial, an oil spill had occurred on the site. The oil ran into a drainage culvert. Laboratory testing of soils taken from the area of the spill and other areas of the site in April and May, 2013, showed levels of petroleum hydrocarbons that exceeded department cleanup criteria as well as ethanol, a gasoline additive that degrades quickly and, therefore, must have been of recent origin. The tests also revealed lead, nickel, copper, zinc, volatile and semivolatile organic compounds that exceeded remediation standards, and nearly the same level of pollutants in surface water samples.

[13] General Statutes § 22a-354s (c) provides: “Any person who wilfully or knowingly violates any provision of sections 22a-354o to 22a-354t, inclusive, or section 14 of public act 89-305 shall be fined not more than one thousand dollars for each day during which such violation continues or be imprisoned not more than six months or both. For a subsequent violation, such person shall be fined not more than two thousand dollars for each day during which such violation continues or be imprisoned not more than one year or both. For the purposes of this subsection, ‘person' shall be construed to include any responsible corporate officer.”

[14] General Statutes § 22a-438 (a) provides in relevant part: “In determining the amount of any penalty assessed under this subsection, the court may consider the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court. The court shall consider the status

of a person or municipality as a persistent violator. . . .''

[15] We note that these factors have been considered in determining the amount of the fine to be imposed pursuant to § 22a-438 (a); see *Keeney* v. *L & S Construction*, 226 Conn. 205, 214, 626 A.2d 1299 (1993); but they were not intended to be used in crafting injunctive relief pursuant to § 22a-430 (d). It is unclear whether the trial court in the present case considered the factors in fashioning its injunctive orders.

[16] The court noted that counsel had estimated that the cost of investigation and remediation would ''run from tens to hundreds of thousands of dollars.'' No evidence as to remediation costs, however, was presented at trial.

[17] General Statutes § 22a-354s (b) provides in relevant part: ''Any person who commits, takes part in, or assists in any violation of any provision of sections 22a-354o to 22a-354t, inclusive . . . shall be assessed a civil penalty of not more than one thousand dollars for each offense. . . .''

[18] It appears that the trial court was led astray by the testimony of the defendants' expert, Jeffrey Loureiro. Loureiro testified at trial that there had been a ''spill'' of petroleum products at the site in April, 2013, that had required a ''report.'' See footnote 11 of this opinion. In response to the spill, the defendants hired an environmental consultant to excavate the contaminated materials, to dispose of them and to sample the materials that remained on the site. After this emergency response to the spill, the department's Oil and Chemicals Spills Division closed the incident report and required no further remediation. Loureiro testified that when the ''significant environmental hazard'' reporting obligations—presumably of § 22a-6u—are triggered, there is no requirement under that statute that the contaminated area be investigated or remediated in accordance with the remediation standard regulations. In Loureiro's opinion, based on the sampling done *in response to the emergency spill*, no further investigation or remediation of the environmental conditions at the site was required by any statute or regulation. He further testified that if samples exceed the remediation standard regulations for certain substances, but not the levels that trigger the ''significant environmental hazard'' reporting requirement, the site owner is not required immediately to report or to remediate the pollution, again, presumably pursuant to § 22a-6u. Rather, according to Loureiro, when pollution exceeding the remediation standard regulations exists on a site, the landowner is required to remediate the pollution only if the property is transferred. In this portion of his testimony, Loureiro was presumably referring to General Statutes § 22a-134, governing the transfer of hazardous waste establishments. Thus, Loureiro effectively testified that, under the Water Pollution Control Act, the fact that a person is causing pollution or owns polluted land, standing alone, does not require the person to remediate the pollution.

Even if, however, the trial court reasonably could have credited Loureiro's testimony on the need for the defendants to remediate the site pursuant to §§ 22a-6u and 22a-134—an issue on which we express no opinion—Loureiro acknowledged on cross-examination that he had never advised a client in an action pursuant to § 22a-430 (d), which clearly authorizes the commissioner to seek remediation of *any* pollution, regardless of whether the pollution would be subject to the reporting or remediation requirements of § 22a-6u or § 22a-134. He also acknowledged that he had never worked on a site subject to such an action, and he had no opinion as to what standards would apply to a remediation order issued pursuant to such an action. Loureiro further testified on cross-examination that he had not reviewed the department's inspection reports concerning the site that predated the emergency spill in 2013. Those reports indicated, among other things, that: numerous areas of the site were stained black with waste motor vehicle fluids, and some of the stains had worsened over time; exposed engine blocks were leaking oil onto the ground; ''[a] stream of what appeared to be diesel fuel'' was running through the site; vehicle fuel tanks that were piled on the ground were leaking diesel fuel; oil was dripping from the vehicle crusher and had pooled on the ground; and there was oily water in a sewer catch basin. Kenneth Feathers, a supervising sanitary engineer employed in the department's remediation division, testified that these reports ''suggest that there is a recurring release of oily material to the soils at the site.'' He further testified that, in the absence of evidence that the oily materials had been removed, ''one would come to the conclusion [that they are still] present and therefore [need] evaluation.'' In Feathers' opinion, ''[t]he soils at the site are polluted at levels that [he] would expect to see pollution of the groundwater under the site were it to be tested.'' We must conclude that the trial court credited Feathers' testimony, because the court

expressly found that "[p]ollution of the surface and groundwater [was] likely given the levels of contaminants in the soil." Feathers testified, and Loureiro conceded, that, when the statutes authorize an order to remediate a polluted site—which § 22a-430 (d) clearly does—the remediation standard regulations are the minimal standards that are acceptable to the state.

[19] To the extent that the levels of pollution that would trigger the reporting provisions set forth in § 22a-6u are the same as those specified in the remediation standard regulations, the trial court's order that the defendants "abate" such pollution would again appear to be inconsistent, because the court concluded that the defendants were not required to fully investigate and remediate the site pursuant to the remediation standard regulations. In addition, this would expose another inconsistency in the court's memorandum of decision, because the court concluded both that the defendants had violated the applicable statutes and regulations and that the "contamination levels were below that posing a significant environmental hazard . . . ."

[20] At best, the order was superfluous because § 22a-6u requires environmental professionals who are engaged in the remediation of pollution and certain landowners to notify the commissioner if contamination by certain substances in certain concentrations are found, even in the absence of a court order.

[21] General Statutes § 22a-423 defines " 'discharge' " as "the emission of any water, substance or material into the waters of the state, whether or not such substance causes pollution . . . ."

[22] General Statutes § 22a-423 defines " 'pollution' " as "harmful thermal effect or the contamination or rendering unclean or impure or prejudicial to public health of any waters of the state by reason of any wastes or other material discharged or deposited therein by any public or private sewer or otherwise so as directly or indirectly to come in contact with any waters . . . ."

[23] General Statutes § 22a-452c provides: "For the purposes of sections 22a-452a and 22a-452b [governing state liens against real estate as security for amounts paid to clean up or to remove hazardous waste], 'spill' means the discharge, spillage, uncontrolled loss, seepage or filtration of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous waste."

[24] Chapter 446k of the General Statutes is the Water Pollution Control Act. Although neither § 22a-133k nor the Water Pollution Control Act itself expressly authorizes the commissioner to adopt remediation standard regulations that apply to *all* actions brought pursuant to that act, the defendants make no claim that the commissioner lacks authority to do so. The defendants also have not identified any other standards under which the existence of pollution can be proved or disproved for purposes of the Water Pollution Control Act. See *Durham Mfg. Co.* v. *Merriam Mfg. Co.*, 294 F. Supp. 2d 251, 271 (D. Conn. 2003) ("[t]he discharge, release or disposal of contaminants exceeding the criteria set forth in the [remediation standard regulations] is prima facie evidence of unreasonable pollution, impairment or destruction of the air, water or other natural resources of the [s]tate"). If the remediation standard regulations do not apply, then presumably "*any* alteration of the physical, chemical or biological properties of any of the waters of the state, including, but not limited to, change in odor, color, turbidity or taste" would justify a remediation order. (Emphasis added.) General Statutes § 22a-423 (defining " 'rendering unclean or impure' " as that phrase is used in statutory definition of " 'pollution' "); see also *Alcoa Composites, Inc.* v. *Dept. of Environmental Protection*, Superior Court, judicial district of New Britain, Docket No. CV-01-0511202-S (D. Conn. April 29, 2002) (under § 22a-423, "the 'pollution' that can give rise to an abatement order can consist of 'any wastes or material' and is not limited to pollution reaching the remediation levels in the regulations").

[25] We note that the legislative history of § 22a-430 (d) sheds little light on the question before us. The provision authorizing the commissioner to request the attorney general to bring an action "for injunctive relief to remediate the effects of such discharge" was added to the statute in 2003. See Public Acts 2003, No. 03-125, § 1. Then Attorney General Richard Blumenthal submitted written testimony to the Joint Standing Committee on the environment in support of the proposed legislation, stating that, in some cases, his office had sought a court order to clean up pollution or to repair damage caused by pollution pursuant to § 22a-430 (d), and the defendants had "challenged whether [his] office may seek a court order to remediate the effects of the discharge into state waters." Conn. Joint Standing Committee Hearings, Environment, Pt. 2, 2003 Sess., p. 514. Blumenthal explained that the legislation "simply clarifies that the [a]ttorney [g]eneral may seek such additional

remedy. The environment would be better protected and judicial resources more effectively used, if the court orders the polluter to restore the waters to [their] original condition as well as to stop the contamination." Id.; see also Office of Legislative Research, Bill Analysis for Substitute House Bill No. 6423, "An Act Concerning Enforcement of Pollution Abatement Orders," (2003), p. 4, available at https://www.cga.ct.gov/2003/FC/pdf/2003HB-06423-R000688-FC.pdf (last visited September 23, 2015) ("[t]his bill authorizes the . . . commissioner to request that the attorney general ask a court to order the [cleanup] of the effects of an illegal discharge"). Although this legislative history supports the proposition that the newly added language would *authorize* the trial court to order a polluter to remediate pollution pursuant to the remediation standard regulations promulgated by the commissioner, it does not compel the conclusion that the trial court is *required* to do so.

[26] If the trial court, upon finding that a defendant had polluted the waters of the state in an action pursuant to § 22a-430 (d), failed to require the defendant to remediate the pollution pursuant to the remediation standard regulations, the commissioner presumably could issue an order to the defendant under General Statutes § 22a-432 "to take the necessary steps to correct such . . . source of pollution." Requiring the commissioner to take this additional action, which would be subject to appeal; see General Statutes § 22a-437; after prevailing in her action pursuant to § 22a-430 (d), would be inconsistent with principles of judicial economy.

[27] In addition, as § 22a-438 (a) makes clear; see footnote 13 of this opinion; the trial court has broad discretion in determining the proper penalty to be assessed for any given violation of the Water Pollution Control Act. In the present case, for example, the amount of the fines imposed by the trial court properly reflected the court's findings that the defendants' conduct, though negligent, was not wilfull, that the defendants generally had cooperated with the commissioner in an effort to clean up the site, and that the economic benefit that they derived from operating the site was modest. Because these findings are supported by the record, the trial court's reliance on them in arriving at an appropriate penalty was perfectly reasonable.

[28] The commissioner cites a number of cases for the proposition that, in determining the proper scope of injunctive relief for violation of a statute, the only consideration is the effectiveness, not the cost, of compliance. See, e.g., *United States* v. *E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 327, 81 S. Ct. 1243, 6 L. Ed. 2d 318 (1961) ("[i]f the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh [economic] consequences"). As we already have indicated, we agree that prevention and elimination of pollution should be the trial court's primary goal in fashioning a remedy for a violation of the Water Pollution Control Act. We also recognize, however, that no court order can squeeze blood from a stone. Nevertheless, we do not suggest that the trial court can never order injunctive relief that is so costly that it would effectively put the defendant out of business, because there may be cases in which that is the only way to ensure compliance with the fundamental purpose of the statutory scheme. We conclude only that, if structuring or limiting the financial burden on a defendant will enhance the defendant's ability to remediate, the costs of remediation may well be a proper consideration in crafting relief. See id. ("[e]conomic hardship can influence choice . . . as among two or more effective remedies").

[29] The parties, of course, may stipulate to any facts found by the trial court in the first trial, which the defendants have not disputed for purposes of the present appeal, or any other relevant facts, in the interest of limiting the scope of the new trial.

[30] General Statutes § 22a-354s (c) provides in relevant part: "*For the purposes of this subsection* [*governing criminal violations*], 'person' shall be construed to include any responsible corporate officer." (Emphasis added.)

[31] The commissioner also relies on *United States* v. *Brittain*, 931 F.2d 1413 (10th Cir. 1991), and *United States* v. *Johnson & Towers, Inc.*, 741 F.2d 662 (3d Cir. 1984), cert. denied sub nom. *Angel* v. *United States*, 469 U.S. 1208, 105 S. Ct. 1171, 84 L. Ed. 2d 321 (1985). Those cases, however, involved the scope of the criminal provision of the federal Clean Water Act, and did not extend liability to civil violations. See *United States* v. *Brittain*, supra, 1419; *United States* v. *Johnson & Towers, Inc.*, supra, 665 n.3. Accordingly, they provide little guidance in the present case.

[32] Moreover, we are not entirely persuaded by the court's reasoning in *United States* v. *Hodges X-Ray, Inc.*, supra, 759 F.2d 561, that, because a corporate officer can be held liable under the responsible corporate officer doctrine for violations of the criminal provision of a strict liability public

welfare statute, which could lead to imprisonment, a fortiori, the officer may be held liable for a civil violation, which could result only in a fine. Holding corporate officers personally liable for the corporation's criminal violations, which, by definition, are knowing violations, creates an incentive for corporate officers to discover and to put an end to them. In contrast, civil violations of strict liability public welfare statutes may be found even in the absence of corporate negligence. In such cases, holding a corporate officer liable when nothing he or she could have done could have prevented the offense reasonably could be seen as unduly harsh. We do not suggest that there are no good reasons to impose liability on responsible corporate officers for civil offenses. As between imposing liability on such officers and potentially leaving the harm to the public unremediated, in the absence of any evidence of legislative intent to the contrary, a court reasonably could conclude that the former choice better promotes public policy. The legislature also reasonably could conclude, however, that liability should be imposed only for criminal offenses, in which case the courts are bound by that legislative determination.

[33] We recognize that this court held in *Celentano* v. *Rocque*, supra, 282 Conn. 666, that the definition of "person" in General Statutes (Rev. to 2007) § 22a-2 (c) (now § 22a-2 [b]) "evidence[d] the legislature's intent to cast a wide net," and supported the conclusion that the responsible corporate officer doctrine applied to violations of General Statutes § 22a-402. Unlike the Water Pollution Control Act, however, there is no express statutory provision in chapter 446j of the General Statutes, governing dams and reservoirs, providing that responsible corporate officers may be held liable for criminal violations. Indeed, there are no criminal penalties at all for a violation of § 22a-402. See General Statutes § 22a-407 (governing penalties for violation of § 22a-402).

---